[No. S010577. July 18, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE McALPIN, Defendant and Appellant.

**COUNSEL**

Campbell & Demetrick, James Farragher Campbell and Linda Lee DeMetrick for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman, Rene A. Chacon, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant appeals from a judgment convicting him of nonviolent lewd conduct with a child under the age of 14. (Pen. Code, § 288, subd. (a).) He complains of a number of evidentiary rulings by the trial court. As will appear, we conclude that the principal rulings were correct, and the incorrect rulings were not prejudicial on the entire record of this case. We therefore affirm the judgment.

Defendant met Anita M. at a church dance in April 1985 and began dating her. Anita, who was divorced, had three children: Stephanie (then age 8), Valerie (then age 7), and Isaac (then age 1). Sunday, June 9, 1985, was Stephanie's ninth birthday. About noon on that day, defendant, Anita, and her children went shopping for birthday gifts for Stephanie. Next they

drove to defendant's house, and after looking at Stephanie's gifts they all lay down together on a large bed in defendant's bedroom to watch television. It was hot, and the children were lightly clothed; the girls wore short "jumper" suits. Anita soon left with Isaac to sit on the floor, and eventually took him outside to play. Defendant remained lying on the bed between the two girls, facing Stephanie.

Stephanie testified that defendant began touching her while her mother was tending to Isaac, and "When my mom would turn around to look at the T.V. or so or somewhere close where he was, he'd stop." The touching continued after her mother took Isaac outside, and Stephanie described the events in detail. On direct examination she testified that "At first [it] was around my pants and then around the elastic part of my underwear." At different times defendant used either his fingers or his whole hand. Stephanie continued, "Then it was inside my underwear," against her skin. Finally, Stephanie testified that defendant put his finger "inside . . . my vagina" and also touched "my chest." Stephanie testified she knew it was wrong for defendant to touch her in this way, but she did not move away at first because she was scared. After a few minutes, however, she told defendant she had to go to the bathroom; instead, she went directly to her mother and told her what defendant had done.

On cross-examination Stephanie not only adhered to her description of defendant's conduct, but gave additional details in response to defense counsel's questions. For example, she explained precisely how defendant touched her when his hand reached the cuff of her suit, illustrating her testimony both by gesture and by reference to a photograph of her taken in that suit on that day.[1] She also reiterated that she did not call out during the touching, but that as defendant moved his hand closer to her vagina she

---

[1] "Q. [By defense counsel.] What was he doing? You said he was touching that portion of your pants? A. Yes. He was—he was rubbing on—around the edges of the cuffs.

"Q. So he would be touching along that cuff area which is shown in that photograph? A. Yes.

"Q. And you're saying that was—A. No. He would be sticking his hands up around there.

"Q. Underneath? A. Yeah.

"Q. And would he be touching the cuff or would he be touching you? A. Me and the cuff.

"Q. And so it would be somewhat like this. How? A. Yeah. Well, like this.

"Q. Touching inside of the cuff or touching your leg? A. Touching the cuff like this and then my leg.

"Q. And moving it around inside, you're saying? A. Yes.

"Q. And—

"Ms. BLAKE [the prosecutor]: For the record the young lady raised her hand and moved it back and forth from her right to her left side.

"THE COURT: All right."

At the time of trial Stephanie was 11 years old and in sixth grade.

became "scareder and scareder." On redirect examination she testified that she did not know what to do when defendant began touching her. And when the prosecutor asked her if she had any other feeling about the experience, she replied, "Sad."

Anita corroborated much of her daughter's testimony. She stated that Stephanie emerged from defendant's bedroom about 10 minutes after she had left with Isaac. According to Anita, Stephanie "came out of the house a little in a hurry and looked at me with an expression that I've never seen on her face before. . . . She looked sick. And she had tears in her eyes." Anita asked what was the matter; at first Stephanie was "pretty choked up with crying" and said that defendant was "bothering" her. When pressed to say how he was "bothering" her, Stephanie "stuttered around with it and finally said, 'Well, he put his hand in my private.'" Anita immediately went inside and confronted defendant, demanding an explanation. Defendant, however, "denied having any idea what was wrong," and went back to whatever he was doing at the time. Anita testified, "I was lost for words" and "I went into shock. I didn't know what to do." She told defendant that maybe she should "just go home," but he suggested instead that they all get something to eat.[2] They went to a restaurant for dinner; at the restaurant Stephanie was quiet and withdrawn, and in the restroom she again talked to her mother about the event.

Anita acknowledged that she dated defendant once more a week or two later, and that she did not report the matter to the police. She did, however, discuss it with her mother, who knew defendant. Shortly thereafter Anita also saw defendant with a mutual friend on a rafting trip sponsored by her church group, and at that time she told the friend about the incident. On redirect examination Anita was asked why she went out with defendant once more after Stephanie told her what had happened, and she replied, "It's in my personality or character, if you will, to sit on the fence until you have enough information to actually point your finger and accuse somebody of something that is that extreme and emotional and traumatic." She also stressed that she had "los[t] a baby and a husband," the latter through divorce, in the year preceding these events.

In June 1986 Stephanie reported the incident to authorities at her school, and the police were notified.

Defendant took the stand and denied the charge. His version of the events leading up to the molestation was the same as that of Stephanie and

---

[2] At this point it was apparently late in the afternoon; Anita subsequently testified that the children had not eaten anything since breakfast, and they were hungry.

her mother, except that he insisted it all occurred one day earlier. With regard to the touching, he told a very different story. First he acknowledged that while ·they were lying together on his bed he put his right arm on Stephanie's thigh. Then he claimed that after Anita left the room with Isaac, Stephanie "started moving her left arm over next to my genitals." Defendant testified that he "grabbed her arm and said, 'don't touch me there' "; that Stephanie left the room and Anita returned soon thereafter; that he and Anita discussed the incident in private; that he told Anita, "Your daughter touched me where she shouldn't have been"; that Anita replied, "yeah, I can believe that. She's pretty aggressive at times"; and that he and Anita then calmly told Stephanie not to let it happen again.

Defendant was allowed to introduce evidence of his standing in the community. Counsel began the case for the defense by eliciting without objection a full statement of defendant's education and employment history: thus defendant testified he had served four years in the Navy; had attended two colleges; had been trained as an electronics technician; had worked first for the Atari Company; had then taken a job with IBM; had worked for six years for IBM, where he became a "senior manufacturing method specialist"; and at the time of trial was a "technical analyst" in "product development" at IBM.

Defendant was also permitted to call two character witnesses on his behalf. The first, Vicki Daybell, was a clerk in the Alameda Superior Court; she was divorced and had a small daughter. She had dated defendant for four or five months, and had stayed in contact with him thereafter. Ms. Daybell testified that in the course of dating defendant she came to know his circle of friends, and from that experience she learned he has an excellent reputation for truth and veracity in the community. As Ms. Daybell testified, "They all regard him very highly . . . [f]or being very honest."

The second witness, Robert Tarkanian, had known defendant for some 11 years. Their friendship began when they were in college together, and continued when they both went to work for IBM. Tarkanian thus came to know defendant's circle of friends on the job, and testified that "He's well respected within the corporation," i.e., among his fellow workers. The witness further testified that on a trip to Texas with defendant they stayed in defendant's family home, and "I was very proud to meet his parents." When asked about defendant's reputation among his fellow workers, Tarkanian reiterated that "He's very well respected." And the witness agreed in particular that defendant has "a high reputation among his fellow workers for truth and veracity."

In rebuttal the prosecution called Debbie Hill. Like Anita, Ms. Hill was a single parent whom defendant had dated. She was also the woman whom

Anita testified she spoke with on a rafting trip shortly after these events. Ms. Hill testified that when Anita spoke with her on the topic she was "extremely upset" and told her what had happened between defendant and Stephanie. According to Ms. Hill, Anita explained that "I wanted to let you know because you have children and you do see him." On cross-examination Ms. Hill testified she was shocked and thereafter "monitored" defendant's interaction with her children because she was afraid.

The jury returned a guilty verdict after 45 minutes' deliberation. The Court of Appeal affirmed the ensuing judgment of conviction, and we granted review.

I

Defendant first contends the trial court abused its discretion in allowing opinion testimony by an expert witness. (Evid. Code, § 801.) The prosecutor proposed to call Police Officer Jeffrey Miller as an expert on child molestation investigations. Defense counsel examined Officer Miller at length on voir dire. It appeared from such examination that the witness had received from 350 to 400 hours of specialized training in such topics as juvenile and adolescent psychology, physical, sexual or emotional abuse of children, intervention in family crisis situations, investigation of child abuse charges, behavioral responses of child abuse victims, and the dynamics of child abuse offenders. Officer Miller received his training not only from law enforcement personnel but also from physicians, social workers, probation officers, school administrators, attorneys and judges. The witness put his training to use on a daily basis in his work as the juvenile investigator for his local police department, and in that capacity he had investigated over 100 cases of child abuse or molestation during the preceding 4 years. He had also taught and spoken extensively on the topic, and had testified several times as an expert witness.

The prosecutor declared that she intended to ask Officer Miller, on the basis of his training and experience, (1) whether a parent might not report a known child molestation, and if so, why; and (2) whether there is a profile of a "typical" child molester. Defense counsel voiced a rambling and confused objection.[3] The trial court interpreted the objection to state three

---

[3] In its entirety, defense counsel's objection was as follows: "My objection to this kind of testimony is this. We have a rule of evidence indicating that when you have hearsay evidence coming in and the question is is the probative value outweighing the prejudicial effect of that kind of testimony. In examining this kind of testimony we have really not scientific evidence but studies being applied. Meaning on one case this happened, on another case this happened, this case happened. And so the responses are like this. All we're doing is Nancy reacted this way, Jane reacted this way. Twelve people can think about that any way. All they're doing there is through some form of a witness which has some form of scientific credence

separate grounds, and overruled it on each ground: "On this matter the Court's going to rule this witness be allowed to testify as an expert. I am satisfied, number one, he does possess the qualifications from the extensive voir dire. Number two, I think it is relevant and, number three, to the extent that the objection is under [Evidence Code section] 352 I think the probative value of this testimony in light of the facts of this case outweighs its prejudicial nature."

Officer Miller then gave his testimony on the two questions propounded by the prosecutor. First, he listed a number of reasons why a parent might not report a known child molestation, including the fear of breaking up the marriage or harming relations with other family members, a sense of shame or failure as a parent, a psychological refusal to accept the fact of the molestation, or a reluctance to damage the reputation of the alleged offender when the latter is someone of good standing in the community (e.g., a schoolteacher or a businessman). In conclusion, Officer Miller testified that it would not be unusual for a parent to refrain from reporting a child molestation until actually confronted with the fact by a law enforcement agency.

On the second question, Officer Miller testified there is no profile of a "typical" child molester; rather, such an individual can be of any social or financial status, any race, any age, any occupation, any geographical origin, and any religious belief or no religious belief at all. Finally, Officer Miller testified that such offenders can also be persons of good or even impeccable reputations in the community.

Opinion testimony by an expert witness is admissible if it is, inter alia, "Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)). The Court of Appeal was of the view that neither branch of Officer Miller's testimony assisted the jury, and hence that neither should have been admitted. Defendant agrees, and adopts that conclusion.

We disagree. The governing rules are well settled. ■ First, the decision of a trial court to admit expert testimony "will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240], and cases cited.) ■ Second, "the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert

---

reinforcing the testimony that only human beings can be child molesters. That's totally unreliable. And that's one of the criterias which you determine whether you have this kind of testimony and I am saying this is unreliable testimony, it is not any scientific studies involved. To be able to substantiate taking expert testimony in this field."

opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness'" (*People v. McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]). As will appear, on this record the trial court could well determine that both aspects of Officer Miller's testimony would assist the jury in at least some degree.

### A

■ We begin with Officer Miller's testimony that it is not unusual for a parent to refrain from reporting a known molestation of his or her child. The People draw a helpful analogy to expert testimony on common stress reactions of rape victims ("rape trauma syndrome"), which may include a failure to report, or a delay in reporting, the sexual assault. In *People v. Bledsoe* (1984) 36 Cal.3d 236, 248-251 [203 Cal.Rptr. 450, 681 P.2d 291], we held that such testimony is inadmissible when offered to prove that the complaining witness has in fact been raped. But we recognized, as other courts had held (*Delia S. v. Torres* (1982) 134 Cal.App.3d 471, 478-480 [184 Cal.Rptr. 787]), that such testimony is admissible to rehabilitate the complaining witness when the defendant impeaches her credibility by suggesting that her conduct after the incident—e.g., a delay in reporting—is inconsistent with her testimony that she was raped. We reasoned that "in such a context expert testimony on rape trauma syndrome would play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (36 Cal.3d at pp. 247-248.)

An even more direct analogy may be drawn to expert testimony on common stress reactions of children who have been sexually molested ("child sexual abuse accommodation syndrome"), which also may include the child's failure to report, or delay in reporting, the abuse. In a series of decisions the Courts of Appeal have extended to this context both the rule and the exception of *People v. Bledsoe, supra,* 36 Cal.3d 236: i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 390-394 [249 Cal.Rptr. 886]; *People v. Gray* (1986) 187 Cal.App.3d 213, 217-220 [231 Cal.Rptr. 658]; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1097-1100 [215

Cal.Rptr. 45].)[4] "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony." (Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb. L. Rev. 1, 89, fn. omitted (hereafter Myers).)

In the case at bar the challenged expert testimony dealt with the failure not of the child victim, but of the child's parent, to report the molestation. Yet the foregoing rules appear equally applicable in this context. The prosecution did not seek to introduce Officer Miller's evidence for the purpose of proving that Stephanie was in fact molested, but to rehabilitate the corroborating testimony of Anita, her mother. On direct examination Anita had corroborated Stephanie's claim of sexual abuse by testifying to the effect that when Stephanie emerged from defendant's bedroom and said he had molested her, Anita had believed her: for example, Anita testified that when she subsequently broke off her relationship with defendant it was "Because I knew what Stephanie had told me was true." On cross-examination, defendant sought to impeach Anita's credibility by strongly implying that her behavior after the alleged incident was inconsistent with that of a mother who believed her daughter had been molested. Thus when Anita admitted she had sexual intercourse with defendant a week later, defense counsel twice asked rhetorically, "Is that how you believe Stephanie?" And counsel asked the same question when Anita conceded she did not report the molestation to the police even though she knew it was a criminal act.[5]

---

[4] Accord, *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 [271 Cal.Rptr. 653]; *People v. Stark* (1989) 213 Cal.App.3d 107, 115-117 [261 Cal.Rptr. 479]; *People v. Bergschneider* (1989) 211 Cal.App.3d 144, 158-160 [259 Cal.Rptr. 219]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 733-737 [256 Cal.Rptr. 446]; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 586-589 [252 Cal.Rptr. 596]; and *People v. Luna* (1988) 204 Cal.App.3d 726, 734-737 [250 Cal.Rptr. 878].

[5] The following colloquy took place on cross-examination:

"Q. [By defense counsel.] Now, you've testified in answer to [the prosecutor's] question this relationship broke off because you knew what Stephanie had said is true, isn't that what you said? A. Yes.

"Q. Knowing this to be true as you indicate you never did take steps to go to the police, did you? A. No, I didn't.

"Q. You understood that that kind of action was illegal and a criminal act, did you not? A. I don't think I fully thought of all that was involved.

"Q. Did you understand that it was a criminal act?

"A. Yes.

"Q. You didn't go to the police did you? A. No.

"Q. It was only when confronted by an outside agency that you began to carry out steps with regard to this matter; isn't that correct? A. Yes.

"Q. And that was roughly a year and a half later; isn't that correct? A. A year.

"Q. *Are you indicating to us this is the manner in how you reacted when you believed what Stephanie had said?* A. *Yes.*" (Italics added.)

Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial. It is reasonable to conclude that on the basis of their intuition alone many jurors would tend to believe that a parent of a molested child, naturally concerned for the welfare of the child and of other children, would promptly report the crime to the authorities, just as a parent would be likely to do if the child complained of someone who had beaten him or stolen his pocket money. Yet here the prosecution had evidence to the contrary—the expert opinion of Officer Miller that in fact it is not at all unusual for a parent to refrain from reporting a known child molestation, for a number of reasons. Such evidence would therefore "assist the trier of fact" (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate Anita's credibility.[6] And the evidence was clearly relevant (*id.*, § 210) because it tended to rehabilitate the testimony of Anita as a corroborating witness.[7] It follows that the trial court did not abuse its discretion in admitting the challenged testimony.

### B

██ Much of the foregoing analysis also applies to Officer Miller's expert testimony that there is no profile of a "typical" child molester, and that such persons are found instead in all walks of life. On this point it is reasonable to conclude that many jurors would tend to rely not so much on their personal intuition but on the widespread public image of the child molester as an old man in shabby clothes who loiters in playgrounds or schoolyards and lures unsuspecting children into sexual contact by offering them candy or money. As numerous studies by behavioral professionals have shown, this stereotype is deeply ingrained in the public consciousness: "The layperson imagines the child offender to be a stranger, an old man, insane or retarded, alcohol or drug addicted, sexually frustrated and impotent or sexually jaded, and looking for 'kicks.' He is 'gay' and recruiting little boys into homosexuality or he is 'straight' and responding to the

---

[6] The evidence is of assistance to the jury even though the mental health profession has not—or not yet—formally labeled it as a "syndrome." (See *People* v. *Bowker*, *supra*, 203 Cal.App.3d 385, 392, fn. 8. ["An expert has little need to refer to the syndrome in order to testify that a particular type of behavior is not inconsistent with a child having been abused."].)

[7] The relevance of the evidence is not undermined by the fact that some of the reasons given by Officer Miller for a parent's failure to report seem not to apply in the case at bar, e.g., a fear of breaking up a marriage or harming another family member. Other reasons he gave may well apply here, e.g., a sense of shame or failure as a parent, or a psychological refusal to accept the fact of the molestation. The latter, indeed, is strongly suggested by Anita's testimony on the point.

advances of a sexually provocative little girl. . . . He is sometimes regarded as a brutal sex fiend or as a shy, passive, sexually inexperienced person. He is oversexed or he is undersexed; and so on. These are popular notions appealing in their simplicity—even if they are self-contradicting—and they offer the advantage of making the child offender as different and unlike the ordinary person—ourselves, our parents, our children, our relatives, friends, and teachers—as possible." (Groth, *Patterns of Sexual Assault Against Children and Adolescents*, in Sexual Assault of Children and Adolescents (Burgess et al. edits. 1978) pp. 3-4 (hereafter Groth); accord, Cerkovnik, *The Sexual Abuse of Children: Myths, Research, and Policy Implications* (1985) 89 Dick. L. Rev. 691, 692-694.)[8]

This stereotype, however, is false. The same studies report that in most cases the child molester is not in fact a stranger to his victim, is not an old man, is not an alcoholic, is not mentally retarded, and is not homosexual.[9] A recent major study of paraphiliacs—the class of sexual deviants that includes child molesters—found that their ages ranged from 13 to 76, with a mean age of 31.5 years; many were well educated; almost 65 percent were employed; they "came from a broad spectrum of socioeconomic levels," with almost one-quarter earning over $25,000 per year; their religious affiliations were various; and, in sum, they were "a very heterogeneous group." (Myers, *supra*, 68 Neb. L. Rev. 1, 130.) "Thus, it is appropriate to conclude that under the current state of scientific knowledge, there is no profile of a 'typical' child molester." (*Id.* at p. 142.)

In the case at bar Officer Miller was prepared to give expert testimony to the foregoing effect. Such testimony would therefore "assist the trier of fact" (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate the People's evidence. Of course, to be admissible the testimony also had to be relevant. (*Id.*, § 350.) But "the trial court is vested with wide discretion in determining relevance" under the Evidence Code. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant fails to show an abuse of such discretion. Although Officer Miller's testimony was admitted during the prosecution's case-in-chief, the jurors already knew much about defendant at that point, and what they

---

[8] "In the mind of the public a child molester is many things: a desperate, pitiful individual, such as Peter Lorre portrayed in the 1931 film classic, *M*; a dangerous, anonymous psychopath who snatches unsuspecting children from playgrounds and grabs headlines in newspapers; and the lecherous, 'dirty old man' popularized in *Hustler* magazine's 'Chester the Molester' cartoons." (de Young, The Sexual Victimization of Children (1982) p. 114.)

[9] Thus Groth reports that 80 percent of the child molesters in his study committed their first offense by the age of 30, and all had done so before reaching 40; the majority knew their victims at least casually; the majority did not abuse alcohol; there is "no significant difference in intelligence between child offenders and the general population"; and the offenders who also had adult sexual relations were heterosexual. (Groth, *supra*, at p. 4.)

knew did not fit the stereotype. They knew defendant was not a stranger to the victim: the first witness in the trial, Stephanie's mother, had testified that she dated defendant for several months before the crime took place, and that Stephanie knew him through that relationship. From the same witness's testimony that she had had sexual intercourse with defendant, the jurors could reasonably infer he was not a homosexual. And the jurors could obviously see for themselves that he was not an old man.[10] In these circumstances the court did not abuse its discretion in finding that the proposed expert testimony of Officer Miller was relevant at the time it was offered. (Cf. *People* v. *Sanchez, supra,* 208 Cal.App.3d 721, 735-736 [evidence on child sexual abuse accommodation syndrome admissible in People's case-in-chief because issue had been raised by earlier testimony of prosecution witnesses].)

## II

Defendant next contends the trial court abused its discretion in limiting the scope of his character evidence. As noted above, the court allowed defense character witnesses Daybell and Tarkanian to testify that defendant had an excellent reputation for truth and veracity in the relevant community. The court disallowed additional character evidence on a different topic—defendant's sexuality—offered by three witnesses whom defendant did not identify by name. Two of these witnesses were women who had dated defendant for approximately six months, had been sexually intimate with him during that period, and thereafter had continued their friendship with him; each also had a daughter of her own. The third witness was a close male friend from defendant's college days who had often double-dated with him and had met many of the women defendant dated.

The record of what these witnesses would actually have said is unsatisfactory. Rather than putting the witnesses on the stand and asking them specific questions, defense counsel presented their proposed testimony by means of a written offer of proof. Although the procedure is proper, in this case much of the wording of counsel's offer of proof was ambiguous or conclusory, and counsel did not further explain it at the hearing. The trial court interpreted the offer in order to rule on it; the court's interpretation was reasonable, and counsel apparently accepted it. We shall therefore be guided by that interpretation in the discussion that follows.

The proposed testimony of defendant's additional character witnesses may conveniently be grouped into two categories.

---

[10] At the time of trial defendant was 36 years old.

## A

■ First, all three witnesses proposed to testify that in their opinion defendant is not a "sexual deviant." The male character witness would have based this opinion on his observations of defendant's assertedly normal sexual conduct with adult women. The women character witnesses would have based their opinions to this effect on two sources: (1) their assertedly normal personal sexual experiences with defendant, and (2) their observations of defendant's conduct with their daughters during the period of their relationship. The trial court disallowed this testimony primarily on the ground that the question whether a person is a sexual deviant can only be answered by expert testimony. Although we need not go so far, on a related ground we will agree with the ruling in part and disagree with it in part.

Evidence Code section 1101, subdivision (a), declares the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1102 of the same code (hereafter section 1102) provides the exception that defendant here sought to invoke: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character." ■ This exception allows a criminal defendant to introduce evidence, either by opinion or reputation, of his character or a trait of his character that is "relevant to the charge made against him." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1102, p. 12.) Such evidence is relevant if it is inconsistent with the offense charged—e.g., honesty, when the charge is theft—and hence may support an inference that the defendant is unlikely to have committed the offense. In appropriate cases, such circumstantial evidence "may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt." (*Id.* at p. 13; see also *Michelson* v. *United States* (1948) 335 U.S. 469, 476 [93 L.Ed. 168, 174, 69 S.Ct. 213].)

We recently held that a defendant charged with child molesting may introduce such character evidence by means of opinion testimony of an *expert* witness. (*People* v. *Stoll* (1989) 49 Cal.3d 1136 [265 Cal.Rptr. 111, 783 P.2d 698] (hereafter *Stoll* ).) Following our decision in *People* v. *Jones* (1954) 42 Cal.2d 219, 222-225 [266 P.2d 38], we held in *Stoll* that in a child molestation case (1) the fact that the defendant is not a sexual deviant is a relevant character trait within the meaning of section 1102, and (2) the statute allows a defendant to prove that trait by the opinion testimony of an

expert witness. (49 Cal.3d at pp. 1152-1155.) It is true that nothing we said in *Stoll* limited such opinion testimony to that of an expert; nevertheless, our analysis in *Stoll* points the way for us today.

After concluding that lack of sexual deviance is a character trait subject to proof by opinion testimony, we turned in *Stoll* to the specific rules for admitting such testimony. The Evidence Code sets forth those rules in its sections 800 (lay opinion testimony) and 801 (expert opinion testimony). In *Stoll* (49 Cal.3d at pp. 1153-1154) we read the latter provision into section 1102, and inquired whether expert opinion testimony concerning a defendant's lack of sexual deviance relates to a subject beyond the ordinary experience of the triers of fact (Evid. Code, § 801, subd. (a)) and is based on sources on which experts may reasonably rely (*id.*, subd. (b)).

 Following *Stoll*, we now read Evidence Code section 800 into section 1102 and inquire whether lay opinion testimony concerning a defendant's lack of sexual deviance satisfies the requirements of the former. Evidence Code section 800 limits lay opinion testimony to an opinion that is "(a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony." Our focus is on the requirement of subdivision (a) of this statute.[11] The meaning of subdivision (a) is clear: "A witness who is not testifying as an expert may testify in the form of an opinion *only if the opinion is based on his own perception.*" (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 800, p. 376, italics added.) As the drafters acknowledge (*ibid.*), this was also the common law rule. (See, e.g., *Stuart v. Dotts* (1949) 89 Cal.App.2d 683, 686-687 [201 P.2d 820]; *Manney v. Housing Authority* (1947) 79 Cal.App.2d 453, 459 [180 P.2d 69].) In this context, moreover, the drafters define "perception" as the process of acquiring knowledge "through one's senses" (Evid. Code, § 170), i.e., by personal observation.[12]

---

[11] The requirement of subdivision (b) of section 800 is not at issue here. The purpose of that subdivision is to determine when a lay witness may supplement or illustrate his factual testimony by drawing therefrom his own conclusion or inference, i.e., his opinion: under the Evidence Code that opinion need only be "helpful"—rather than necessary—to understanding the witness's testimony. (See Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. VII, Expert and Other Opinion Testimony (Mar. 1964) 6 Cal. Law Revision Com. Rep. (1964) pp. 931-935.) But under section 1102 no such factual testimony is permitted in any event: the defendant's character may be proved only by "opinion" or "reputation." (Compare Evid. Code, § 1103 [evidence of "specific instances of conduct" is admissible to show character of *victim* in similar circumstances].)

[12] The contrast, of course, is with opinion testimony by an expert, which may be based on information furnished to the expert by others, provided only that it is the kind of information on which experts may reasonably rely. (Evid. Code, § 801, subd. (b).) As succinctly put in *Manney v. Housing Authority, supra*, 79 Cal.App.2d 453, 459-460, "For a nonexpert to be competent to give an opinion . . . he must be testifying about facts that he has personally observed; but the expert . . . may give his opinion, although he did not personally observe the

The cases allowing lay opinion testimony uniformly note that it was based on the witness's personal observation. Thus in *Jordan* v. *Great Western Motorways* (1931) 213 Cal. 606, 612 [2 P.2d 786], this court reasoned: "Over objection of counsel, plaintiff was allowed to testify as to the speed of the bus and [her driver's] automobile. We find no error in the trial court's ruling. A person *having the opportunity to observe* the speed of a moving vehicle is qualified to give his opinion as to such speed, and his previous experience or lack of experience goes to the weight rather than to the competency of the testimony. [Citations.] [¶] Nor do we find error in the ruling permitting a lay witness to testify regarding the condition of plaintiff's health. Lay witnesses *having the requisite opportunity for observation* may testify as to the health of another." (Italics added.)

In *Kline* v. *Santa Barbara etc. Ry. Co.* (1907) 150 Cal. 741, 750 [90 P. 125], this court held admissible lay opinion testimony as to the extent of an accident victim's pain and suffering: "It does not require an expert to tell whether a person suffers. The appearance of a person who suffers severely is sufficient to manifest his condition to any one of ordinary intelligence and experience. These witnesses had all *observed her, had heard her groans and complaints*, and were competent to give an opinion as to her suffering." (Italics added.)

In *People* v. *Manoogian* (1904) 141 Cal. 592 [75 P. 177], this court held admissible lay opinion testimony as to whether the defendant was acting rationally or irrationally. The court reasoned that the questions asked of the witnesses on this topic "did not call for the opinion of the witnesses as to the mental sanity of the defendant, but for *the result of their observations* at the various times they came in contact with him, as to his appearance in the respects suggested." (*Id.* at p. 595, italics added.) Summing up, the court reiterated that such questions "simply call for the result of *the observation of the witness* as to the manner or conduct of such person at a certain time." (*Id.* at pp. 597-598, italics added.)

In *Healy* v. *Visalia etc. R.R. Co.* (1894) 101 Cal. 585 [36 P. 125], a woman was thrown from a railroad car when it derailed and a fellow passenger was asked for his lay opinion as to whether an average person could have withstood the force of the accident. This court held the question admissible, reasoning that it "did not call for an opinion from [the witness] depending upon facts which he had subsequently learned, but he was asked to describe the effect of the concussion or jar caused by the car leaving the track, as one of the facts out of which the injury had arisen, and which *he*

---

facts, basing his opinion upon the facts testified to by other witnesses [and] put to him in the form of hypothetical questions."

*had personally observed and felt.* [¶] . . . Such testimony is competent upon the same principle that permits evidence showing the strength or force of a blow, the distance at which a sound can be heard, or the direction from which it comes, the speed of a horse, the degree of cold or heat, or of light or darkness. In any such instance a witness *who had a personal experience or knowledge of the sensation* is competent to testify, although his answer is only his opinion of the matter." (*Id.* at pp. 589-590, italics added.)

In *People* v. *Ravey* (1954) 122 Cal.App.2d 699, 703 [265 P.2d 154], the court held admissible lay opinion testimony as to whether the defendant was intoxicated, reasoning that "the question of whether a person was intoxicated is not necessarily a matter of expert testimony, as any layman can give his opinion *based upon his own observation.*" (Italics added.) And in *People* v. *Williams* (1988) 44 Cal.3d 883, 914 [245 Cal.Rptr. 336, 751 P.2d 395], the defendant complained that a detective and a jailer in whose custody he had spent time gave nonexpert testimony "that in their opinion defendant was not 'strung out' [i.e., intoxicated by drugs] when they observed him." In a well-considered dictum we found no reason to distinguish lay opinion on drug-induced intoxication from the settled rule allowing such opinion on alcohol-induced intoxication. (*Id.* at pp. 914-915.)

■ By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible. Thus in *Kinsey* v. *Pacific Mutual Life Ins. Co.* (1918) 178 Cal. 153 [172 P. 1098], the plaintiff's decedent died while bathing in the surf, and in plaintiff's action on decedent's life insurance policy the issue was whether the cause of death was accidental drowning or heart failure arising from a preexisting condition. Defendant insurance company called as witnesses the lifeguards who assisted in rescuing the decedent's body from the water and in attempting to resuscitate him. The defendant asked these witnesses questions eliciting "their opinion *based upon their observation* of deceased as to whether the death of deceased was due to drowning." (*Id.* at p. 156, italics added.) The trial court excluded the testimony, and this court found no abuse of discretion in the ruling: "The evidence, while perhaps showing that these witnesses were skilled in the methods of rescuing drowning persons from the water, fails to show that they had any knowledge, gained by experience or otherwise, upon which, *from their observation of the appearance* of the body of deceased, they were as a matter of law entitled to testify to their opinions as to the cause of the death of deceased." (*Ibid.,* italics added.)

■ In the case at bar we apply this rule to the proposed testimony of defendant's three additional character witnesses that in their opinion defendant is not a "sexual deviant," i.e., in the words of defendant's offer of proof, "a person of lustful or lewd conduct with children." The proposed

opinion testimony of the male character witness to this effect was not based on personal observation of defendant's "conduct with children"; under the foregoing cases, therefore, the trial court did not abuse its discretion in disallowing his testimony. To the extent that the same opinion of the women character witnesses was based on their private sexual experiences with defendant rather than on their observation of his behavior with their daughters, the trial court could disallow it for the same reason.[13]

The opinion of the women character witnesses, however, was also based on their observation of defendant's conduct with their daughters. According to the offer of proof, the women proposed to testify that in the course of their relationship with defendant they observed his conduct with their daughters and saw no unusual behavior either by defendant or by their daughters, and that it is their opinion, based on those personal perceptions, that defendant is not a person given to lewd conduct with children. Because the latter conclusion of the witnesses was based on their direct observation of defendant's behavior with their daughters, it was both a proper subject of lay opinion testimony and relevant to the charge of child molestation. Indeed, the People do not contend otherwise. Rather, the People claim the testimony was inadmissible on a wholly different ground, i.e., that its admission would have violated the rule against proving a character trait of the accused by means of specific acts. (*People* v. *Cordray* (1962) 209 Cal.App.2d 425, 439-440 [26 Cal.Rptr. 42]; see Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1102, pp. 13-14.) The trial court so ruled and the Court of Appeal agreed, but we do not.

A fair reading of the offer of proof shows that the women witnesses would not have limited their testimony to specific instances in which defendant had the opportunity to, but did not, molest their daughters.[14] Instead, the witnesses proposed to testify that they observed defendant's behavior with their children throughout the course of their relationship with him, and their opinion that he is not a person given to lewd conduct with children arose from that experience as a whole. Thus viewed, the proffered testimony was intended to prove the relevant character trait not by specific acts of "nonmolestation," but by the witnesses' opinion of that trait based on their long-term observation of defendant's course of consistently normal behavior

---

[13] If, in a child molestation case, a lay character witness with opportunity to observe were to testify *only* that in his or her opinion the defendant's sexual behavior with adult women was normal, a different question might be presented. We do not reach that question in the case at bar, because like the trial court we do not construe the offer of proof to present such testimony.

[14] The proffered testimony is thus distinguishable from the hypothetical suggested by the trial court, viz., "it's like saying, well, this defendant is charged with robbing a bank and I have a witness who saw him walk past a bank a week before without robbing it."

with their children. The trial court should have allowed such testimony.[15]

### B

The offer of proof also included proposed testimony by the women character witnesses to the effect that (1) defendant has a reputation in the community for "normalcy in his sexual tastes" and (2) in their opinion defendant is a person of "high moral character." As to these two items, however, the record is even more unsatisfactory than the record of the testimony thus far discussed. The quoted phrases are patently ambiguous, each having several plausible meanings. Yet defense counsel did not explain either of these items at the hearing. Perhaps because of their obvious vagueness, the trial court did not discuss them either; and although we must infer that the court impliedly disallowed both items, there is no record of the reasons for that ruling. Our review of their admissibility will therefore be brief.

█ We begin with the proposed testimony that defendant has a reputation for "normalcy in his sexual tastes." In the present context that quaintly genteel phrase can reasonably be taken to mean either that defendant has a reputation for being sexually attracted to adult women or that he does *not* have a reputation for being sexually attracted to young girls. We need not reach the question of its relevance under the former construction, however, because under the latter construction the proposed testimony is relevant to a charge of child molestation. Evidence that a defendant does *not* have a bad reputation for a relevant character trait is admissible as tending to show that he has a good reputation for that trait. (*People* v. *Hoffman* (1926) 199 Cal. 155, 161 [248 P. 504]; *People* v. *Castillo* (1935) 5 Cal.App.2d 194, 198 [42 P.2d 682], and cases cited; see also *Michelson* v. *United States*, *supra*, 335 U.S. 469, 478 [93 L.Ed. 168, 175].) And under either construction the testimony is not objectionable on the ground discussed in a preceding

---

[15]The trial court also excluded this testimony under Evidence Code section 352, ruling that its probative value would be outweighed by the time it would take to introduce it and the confusion it would cause. Although the trial court is vested with wide discretion in making that determination, we agree with defendant that its discretion was abused in the particular circumstances of the case at bar. Here the trial in its entirety consumed very little time: the People's complete case-in-chief took less than four hours, and defendant put on his entire defense in less than ninety minutes. The character testimony of witnesses Daybell and Tarkanian was very brief, and there is no reason why this additional character testimony could not have been likewise; nor was extensive cross-examination likely, because defendant had no criminal record. Second, this character testimony was limited to the main issue in the case, i.e., whether defendant committed the lewd act that Stephanie described; it would not have raised any new question, such as, for example, the possibility that a third person committed the act. Its admission thus would not have created a "substantial danger . . . of confusing the issues" within the meaning of Evidence Code section 352.

portion of this opinion, because it is evidence of reputation rather than lay opinion. "Reputation is not what a character witness may *know* about defendant. Reputation is the estimation in which an individual is held; in other words, the character imputed to an individual rather than what is actually known of him either by the witness or others." (*People* v. *McDaniel* (1943) 59 Cal.App.2d 672, 676 [140 P.2d 88].) The rule that lay opinion testimony must be based on the witness's personal observation thus does not apply to reputation testimony, and indeed the Evidence Code imposes no such requirement. The trial court should therefore have allowed this testimony.

■ We turn to the proffered opinion of the witnesses that defendant is a person of "high moral character." In the context of the offer of proof we construe the word "moral" in this phrase to refer to *sexual* morality. Thus construed, "moral character" is a trait that is relevant to a sex offense charge, including the present prosecution for child molesting. We are cited to no California decision that squarely so holds, but such evidence has routinely been admitted in trials for sex offenses without drawing adverse comment by reviewing courts. (See, e.g., *People* v. *Wrigley* (1968) 69 Cal.2d 149, 153-154 [70 Cal.Rptr. 116, 443 P.2d 580]; *People* v. *White* (1954) 43 Cal.2d 740, 744 [278 P.2d 9]; *People* v. *Jones, supra*, 42 Cal.2d 219, 222; *People* v. *Hurd* (1970) 5 Cal.App.3d 865, 880 [85 Cal.Rptr. 718]; *People* v. *Ray* (1960) 187 Cal.App.2d 182, 187 [9 Cal.Rptr. 678]; *People* v. *Rucker* (1960) 186 Cal.App.2d 342, 346 [9 Cal.Rptr. 1]; *People* v. *Spigno* (1957) 156 Cal.App.2d 279, 283 [319 P.2d 458].) Again, therefore, the trial court should have allowed this testimony.

### III

■ The court's error in excluding the foregoing three additional items of character testimony is governed by the standard of prejudice prescribed both by Constitution (art. VI, § 13) and by statute (Evid. Code, § 354), and explained in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (See, e.g., *Stoll, supra*, 49 Cal.3d 1136, 1161-1163 [applying *Watson* test]; *People* v. *Bledsoe, supra*, 36 Cal.3d 236, 251-252 [same].)[16]

---

[16]Defendant contends the error is reversible per se because it assertedly deprived him of certain fundamental rights under the California Constitution and because its effect is impossible to assess. The cases on which he relies for this rule, however, reveal its inapplicability to the error here committed. In *People* v. *Joseph* (1983) 34 Cal.3d 936, 945-948 [196 Cal.Rptr. 339, 671 P.2d 843], we held reversible per se the trial court's erroneous denial of a competent defendant's motion to represent himself in a capital case. In *People* v. *Bigelow* (1984) 37 Cal.3d 731, 744-746 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], also a capital case, we held reversible per se the trial court's erroneous failure to exercise its discretion to appoint advisory counsel to assist a defendant acting in propria persona who had shown himself

Although each case turns on its own facts, we may profitably compare the question before us with our prejudice analysis in *Stoll, supra,* 49 Cal.3d 1136, in which we held reversible under the *Watson* test the exclusion of similar character testimony in a child molestation case. We stressed in *Stoll* certain facts that might well have undermined the jury's confidence in the stories of the child witnesses: in their testimony four of the children contradicted key parts of each other's account of the event, four admitted they had lied at the preliminary hearing, two admitted they had lied at trial, and prior statements by five of the children contradicted parts of their testimony. (*Id.* at p. 1162.) In the case before us there were no such contradictions or admitted untruths in Stephanie's testimony, nor did the defense suggest any persuasive motive for Stephanie to lie repeatedly, over a period of more than two years, to her mother, to the police, and to the jury.

We may also compare the case at bar with *People v. Jones, supra,* 42 Cal.2d 219, a pre-*Watson* case in which we likewise held reversible the exclusion of such character testimony. In *Jones* we stressed that the testimony of the child witness was partially impeached and that there was evidence she had a bad reputation for truth and veracity. (*Id.* at p. 226.) Here Stephanie's testimony was not impeached in any way, and her reputation for truth and veracity was untarnished. Nor is this a case such as *People v. Castillo, supra,* 5 Cal.App.2d 194, 198, in which the reviewing court described the victim's story as "weirdly improbable." There is nothing inherently implausible about Stephanie's testimony.

In addition, it is not unlikely that the jury would have given less weight to the lay testimony excluded here than to the expert opinion excluded in *Stoll* and *Jones*; while that difference does not affect its admissibility, it may affect its weight for purposes of prejudice analysis. Indeed, even while providing for its admissiblity the drafters of the Evidence Code concede that reputation testimony, the traditional means of proving character, is "the least reliable" form of such evidence and is "little more than accumulated hearsay." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1102, p. 13.)

Finally, although defendant seeks to characterize the evidence in this case as evenly balanced (see *People v. Castillo, supra,* 5 Cal.App.2d 194, 199), a review of the transcript shows it was not merely "her word against his": to have acquitted defendant, the jury would have had to believe not only that Stephanie was lying, but that Anita was lying as well. For example, Anita's testimony describing her confrontation with defendant after Stephanie

---

incompetent to serve as his own attorney. The present evidentiary error in excluding certain additional items of character testimony does not remotely approach the gravity of such denials of the fundamental right to counsel, nor is its effect impossible to assess.

reported the molestation to her did not depend on the truth of that report—on that topic Anita was not simply repeating the report—yet it differed dramatically from defendant's version of the confrontation; to that extent at least, Anita and defendant cannot both have been telling the truth. In these circumstances, the speed with which the jury reached its verdict—after only 45 minutes of deliberation—implies that to the triers of fact the case may not have been as close as defendant now speculates.

For all these reasons, after a full review of the record we cannot conclude that it is reasonably probable that a verdict more favorable to defendant would have been reached in the absence of this error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I agree with the majority that the trial court did not err in admitting the expert evidence offered by the prosecution, but I cannot join in the majority's analysis of the trial court's ruling on the good character evidence proffered by defendant or, in particular, in the conclusion that the trial court's error in excluding much of this evidence was not prejudicial. Past California decisions have repeatedly recognized that in cases of this nature, in which a defendant is accused of a sexual offense against a child and the jury's determination necessarily turns on the relative credibility of the defendant and the alleged child victim, a defendant's right to introduce evidence of his good moral character is of crucial importance. Such evidence may be the only, or at least the most significant, evidence that an innocent defendant can present to support his own denial of the offense. As a consequence, the authorities suggest that in this context the erroneous exclusion of such good character evidence generally cannot be found harmless. This general principle has particular force in the present case because the record discloses that this was a much more closely balanced case than the majority opinion allows. Given the nature of the trial court's error and the state of the evidence, I believe that reversal is clearly required.

I

In analyzing the trial court's ruling, it is helpful to begin with a brief overview of the general rules governing character evidence in criminal proceedings. (See generally Wydick, *Character Evidence: A Guided Tour of the Grotesque Structure* (1987) 21 U.C. Davis L.Rev. 123.) In California, as in virtually all jurisdictions in this country, the prosecution in a criminal case

is not permitted to present evidence of the bad character of the defendant to prove that the defendant committed the charged offense unless and until the accused presents evidence of his own good character. (See Evid. Code, §§ 1101, subd. (a), 1102, subd. (b).) The defendant, on the other hand, is specifically authorized by statute to present good character evidence in any criminal case. (See Evid. Code, § 1102, subd. (a).)

In *Michelson* v. *United States* (1948) 335 U.S. 469 [93 L.Ed. 168, 69 S.Ct. 213], the leading United States Supreme Court decision on the subject, Justice Jackson explained the basis for permitting a defendant to introduce such good character evidence: "[The] line of inquiry firmly denied to the State is opened to the defendant because character is relevant in resolving probabilities of guilt. He may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged. This privilege is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt . . . . [Citation.]" (*Id*. at p. 476 [93 L.Ed. at p. 174], fn. omitted. See also *People* v. *Jones* (1954) 42 Cal.2d 219, 223-224 [266 P.2d 38].)

Although it has sometimes been suggested that the sharp distinction between the right of the defendant and that of the prosecution to open the inquiry into the defendant's character is attributable to the law's traditional solicitude for the criminal defendant and to the extremely prejudicial nature of bad character evidence, a leading textbook maintains that the disparate rules also reflect the relative probative value of good character evidence as compared to bad character evidence: "Evidence that the criminal defendant has a bad character may show his capacity to engage in crime but is little proof that he was involved in the particular crime charged, while proof of his good character puts him in a class of people who are highly unlikely to engage in criminal conduct. We admit the latter, not merely because it is less prejudicial to the defendant, but because it is much more probative of guilt or innocence." (22 Wright & Graham, Federal Practice & Procedure (1978) § 5236, p. 381.)

Although good character evidence may be more probative of guilt or innocence than bad character evidence, it is important to recognize that good character evidence, of even the most positive and probative sort, does not purport to establish conclusively that the defendant could not have committed the charged offense. "[O]ne should not ignore the fact that persons of good character may commit a criminal act. The fact that they usually do not do so, or probably do not do so, only makes it improbable, not impossible, for the defendant to have committed the act." (Boller, *Proof of the Defendant's Character* (1974) 64 Mil. L. Rev. 37, 44.) Nonetheless, as

the quoted passage from *Michelson* v. *United States, supra,* 335 U.S. 469, 476 [93 L.Ed. 168, 174], explains, a criminal defendant is entitled to have the jurors consider such probabilities in determining whether they are convinced beyond a reasonable doubt that the defendant is guilty of the charged offense.

It is also relevant to keep in mind that a defendant's introduction of good character evidence is by no means a risk-free proposition. "Two grave risks face the criminal defendant who chooses to . . . offer[] evidence of her good character. The first and most serious risk . . . arises when the prosecutor cross-examines the defendant's character witnesses. . . . [W]hen cross-examining either a reputation or opinion witness, the prosecutor can inquire about *specific acts* in the defendant's past to assess the value of the reputation or opinion testimony. . . . [Although in] theory, the trier of fact cannot use the prosecutor's questions about specific acts as evidence that the acts occurred . . . [and] upon request, the defendant is entitled to a limiting jury instruction[,] . . . [it is well recognized] that jurors probably cannot follow a judge's instruction not to use the question and responses about specific acts as evidence that the acts did occur. . . . The second risk is [that] . . . the prosecutor can call rebuttal witnesses to testify that the defendant's character is bad. As Justice Jackson explained in *Michelson*, a part of '[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.'" (Wydick, *Character Evidence: A Guided Tour of the Grotesque Structure, supra,* 21 U.C. Davis L.Rev. 123, 144-149, fns. and citations omitted.) Accordingly, as the Court of Appeal explained in *People* v. *Pangelina* (1984) 153 Cal.App.3d 1, 8 [199 Cal.Rptr. 916]: "For [these] reason[s], most experienced criminal lawyers do not present character evidence unless their client's reputation is unassailable."

In sum, the right of a criminal defendant to present good character evidence is an important, and at times even a crucial, right, but the consequences that flow from a defendant's decision to open up the subject of character make the right most valuable to those whose character or reputation is unimpeachable.

## II

As the majority indicate, defendant proposed to present evidence of his good character with respect to two separate traits—(1) his character for truthfulness and veracity and (2) his good moral character with regard to sexual matters. The trial court ruled that if defendant testified, he could present evidence of his good reputation for truth and veracity. At the same

time, however, the court rejected the proposed testimony relating to defendant's good moral character with regard to sexual matters.

In analyzing the trial court's ruling on the latter point, the majority note that defendant set forth a summary of the proposed testimony in a written offer of proof. The majority opinion is critical of the wording of defendant's offer of proof, yet it never quotes the offer of proof in full, but instead proceeds to divide the offer of proof into discrete segments and to analyze each segment separately. I believe the majority's analysis obscures the governing legal principles and results in a distorted view of defendant's offer of proof.

Instead of parsing defendant's offer of proof into distinct segments, we should begin by identifying, first, the particular "character or trait of character" of which defendant was entitled to present evidence, and, second, the general kinds of evidence defendant could produce to prove such character trait. Once these general principles are understood, we will have an appropriate basis for assessing defendant's offer of proof.

As to the initial point—the particular trait of character that is relevant when a defendant is charged with a sex offense against a child—the majority opinion ultimately recognizes that in this type of case a defendant is entitled to present evidence of his "good moral character," it being understood that, in this context, "moral" refers to sexual morality. (See *ante,* maj. opn., p. 1311.) While the majority opinion discusses the point only very briefly, the brevity of that discussion should not obscure the fact that it is well established, in California and throughout the country, that a defendant charged with a sex offense is entitled to present evidence of his "good moral character." (See, e.g., *People* v. *Jones, supra,* 42 Cal.2d 219, 222; *People* v. *Castillo* (1935) 5 Cal.App.2d 194, 198 [42 P.2d 682]; *Knorr* v. *State* (1987) 103 Nev. 604 [748 P.2d 1, 2-3 & fn. 2]; *State* v. *Miller* (Utah 1985) 709 P.2d 350, 354; *Thomas* v. *State* (Tex.Ct.App. 1984) 669 S.W.2d 420, 423; *State* v. *Davis* (1950) 231 N.C. 664 [58 S.E.2d 355]; *State* v. *Baldanzo* (1930) 148 N.J.L. 498 [148 A. 725, 67 A.L.R. 1207]. See generally Note, *Have You Heard? Cross-Examination of a Criminal Defendant's Good Character Witness: A Proposal for Reform* (1976) 9 U.C. Davis L.Rev. 365, 368-369, fn. 17; Mauet, *Reputation Evidence in Criminal Trials* (1976) 58 Chi.B.Rec. 72, 72-73.) As these numerous authorities demonstrate, just as a defendant may present evidence of his "honest" character to raise a doubt of whether he committed a charged embezzlement, or evidence of his "peaceable" or "nonviolent" character to counter a charge of assault, a defendant who is charged with a sex offense against an adult or a child has always been permitted to present evidence of his "good moral character" for the jury's

consideration in determining whether there is a reasonable doubt of the defendant's guilt.

As to the second point—the kinds of evidence that a defendant may produce to prove that he or she possesses such a character trait—the answer is clearly provided in the Law Revision Comment accompanying Evidence Code section 1102. That comment explains: "The three kinds of evidence that might be offered to prove character as circumstantial evidence of conduct are: (1) evidence as to reputation, (2) opinion evidence as to character, and (3) evidence of specific acts indicating character." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1102, p. 13.) With respect to reputation and opinion evidence, the comment states: "*Reputation evidence.* Reputation evidence is the ordinary means sanctioned by the cases for proving character as circumstantial evidence of conduct. [Citations.] Both Sections 1102 and 1103 codify the existing law permitting character to be proved by reputation. [¶] *Opinion evidence.* There is recent authority for the admission of opinion evidence to prove character as circumstantial evidence of conduct. [Citation.] However, opinion evidence generally has been held inadmissible. [Citations.] [¶] The general rule under existing law excludes the most reliable form of character evidence and admits the least reliable. The opinions of those whose personal intimacy with a person gives them firsthand knowledge of that person's character are a far more reliable indication of that character than is reputation, which is little more than accumulated hearsay. [Citation.] The danger of collateral issues seems no greater than that inherent in reputation evidence. Accordingly, both Section 1102 and Section 1103 permit character to be proved by opinion evidence." (*Ibid.*) With respect to evidence of specific acts, on the other hand, the comment explains that section 1102 codifies the preexisting rule precluding the use of such evidence to prove the defendant's character. (29B West's Ann. Evid. Code, § 1102, *supra*, at pp. 13-14.) Thus, as this comment makes clear, Evidence Code section 1102 specifically authorizes a defendant to establish his character through either reputation evidence or opinion evidence, and the opinion evidence which the comment specifically commends as the "most reliable form of character evidence" is "[t]he opinions of those whose personal intimacy with a person gives them firsthand knowledge of that person's character . . . ." (29B West's Ann. Evid. Code, § 1102, *supra*, at p. 13.)

When defendant's offer of proof is viewed against the background of these general principles, it becomes clear, in my view, that all of the evidence defendant proposed to introduce was properly admissible as good character

evidence. I set forth the offer of proof in its entirety in a footnote.[1] Read as a whole, the offer indicates that defendant intended to call three lay witnesses to testify as to his good moral character with regard to sexual matters, sets forth each witness's long and close personal relationship with the defendant, and indicates that the witnesses were prepared to testify on the basis of their own opinion and of their knowledge of defendant's reputation in the community. As we have seen, this is precisely the kind of good character evidence that is admissible in a case of this nature under Evidence Code section 1102.

Instead of reading the offer of proof as a whole, however, the majority treat it as if it were, in effect, four distinct offers of proof—(1) an offer to prove defendant's normal or nondeviant sexuality based on the lay witnesses' observations of defendant with adult women, (2) an offer to prove defendant's nonlewd disposition towards children based on the lay witnesses' observations of defendant with children, (3) an offer to have the lay witnesses testify to the bare, conclusory opinion that defendant has a high moral character, and (4) an offer to present evidence of defendant's reputation in the community for sexual normalcy. Viewing the offer of proof in this disjointed fashion, the majority ultimately conclude that the trial court erred in excluding items (2), (3), and (4), but properly excluded item (1). The majority defend the trial court's exclusion of this portion of the

---

[1] Defendant's offer of proof stated: "Defendant has made an offer of proof regarding the introduction of character witnesses pursuant to Evidence Code, section 1102. These witnesses will testify in general as follows:

"1. That they know the defendant. Two of the witnesses are women and have dated him for period [sic] of time of approximately six months but continued their friendship with him after the dating took place. The third witness is a college friend who double dated with him and has gone on vacations with defendant.

"(a) The women character witnesses can testify that they have dated the defendant and in the course of their relationship became intimate sexually. That as a result of such occasions and other intimate moments, it is their opinions [sic] based upon their personal perceptions, that defendant is not what may be referred to as 'sexually deviant', i.e., a person whose sexual behavior is out of the ordinary, in that his sexual drives appeared normal and ordinary. In their opinion, based upon their intimate contact with defendant, the defendant is a person of high moral character.

"In addition, the women, during the course of their contact with defendant came into contact with persons knowing the defendant and came to know his reputations [sic] in his community for normalcy in his sexual tastes.

"(b) That each woman also has a daughter and during the course of their relationship, as a result of observations of defendant's contacts with their children, they observed no inordinate behavior by defendant or by their children. As a result, it is their opinions [sic], based upon personal perceptions, that defendant is not a person of lustful or lewd conduct with children.

"(c) The third witness is a college friend of defendant. They attended Fresno State together. They became good friends and many times double dated. He has met many of the women defendant dated. That as a result of observations of his conduct with the women, then and thereafter, it is his opinion based upon personal perceptions, that defendant is not a sexual deviant and is a person of normal heterosexual drives."

proposed testimony on the ground that the lay opinion testimony encompassed in item (1) was not based on the witnesses' "own perception" as required by Evidence Code section 800, subdivision (a).

In my view, the majority's conclusion on this latter point is flawed on a number of grounds. First, as already indicated, the majority's basic error lies in the failure to read the offer of proof as a whole. When the offer of proof is viewed in its entirety, it is clear that defendant was simply proposing to call three close friends to testify that he was a person of good moral character with regard to sexual matters, i.e., that it would have been out of character for him to have committed the sexual offense with which he was charged. Defendant did not make separate offers of proof with regard to the witnesses' observations of defendant with adults and with children; rather, the single offer of proof was intended to show that the proposed witnesses were close and longtime friends of defendant who had had the opportunity personally to observe him in many social settings, both with adults and with children, and that, on the basis of those observations, the witnesses were of the opinion that defendant's general character was inconsistent with having committed the sexual offense of which he was accused.

In context, it seems evident that the proposed testimony by the lay witnesses that, in their opinion, defendant was not "sexually deviant," was not intended as a clinical, psychological diagnosis; the witnesses, after all, were clearly to be called as lay witnesses. Instead, the proposed testimony, reasonably interpreted, was simply another way of phrasing the witnesses' opinion that defendant was a person of good moral character with regard to sexual matters, that is, a person whose character was inconsistent with sexually molesting a young girl. Because, as the majority recognize, defendant was unquestionably entitled to introduce lay opinion testimony as to his good or high moral character, I conclude that all of the testimony embodied in the offer of proof was properly admissible as evidence of defendant's good moral character.

Second, even if it were proper to view this portion of the offer of proof in isolation, the record clearly belies the majority's conclusion that the trial court could properly exclude the proposed testimony as not based on the witnesses' "own perception." The offer of proof leaves no doubt that the proposed opinion testimony was to be based on the *personal* perceptions and observations of each of the witnesses. Each of the two female witnesses was a personal friend of the defendant who had dated him over a relatively lengthy period of time and had had an intimate sexual relationship with him; the male witness was also a close personal friend who had known defendant over many years, had double-dated with him on many occasions and knew many of the women defendant had dated. Each of the witnesses

had formed her or his opinion as to defendant's character on the basis of the witness's personal experience with defendant in different settings over a considerable period of time. Thus, the proposed testimony clearly rested on the "personal perceptions" of the witnesses. None of the cases cited by the majority even remotely supports their contrary conclusion.

Although the majority purport to rely on the theory that the proposed witnesses' testimony was not based on their "own perceptions," in reality the majority's conclusion appears to rest on the quite distinct proposition that a lay witness whose opinion of a defendant's character is based only on observations of the defendant's conduct with adults cannot properly give character testimony which is relevant to a charge that the defendant engaged in deviant sexual conduct with a child. That proposition, however, is inconsistent with the basic principle that evidence of a defendant's good moral character is admissible when a defendant is charged with a sex offense against a child. Past decisions have routinely approved the admissibility of good moral character testimony in such cases without inquiring whether the good character witnesses had personal knowledge of the defendant's conduct with children as well as with adults. (See, e.g., *People* v. *Wrigley* (1968) 69 Cal.2d 149, 153-154, 165-166 [70 Cal.Rptr. 116, 443 P.2d 580]; *People* v. *Jones, supra,* 42 Cal.2d 219, 222; *People* v. *Anthony* (1921) 185 Cal. 152, 156 [196 P. 47]; *People* v. *Hurd* (1970) 5 Cal.App.3d 865, 877-880 [85 Cal.Rptr. 718]; *People* v. *Ray* (1960) 187 Cal.App.2d 182, 187 [9 Cal.Rptr. 678]; *People* v. *Neal* (1948) 85 Cal.App.2d 765, 767 [194 P.2d 57].) These decisions implicitly recognize that it would be improbable or unlikely for a person of a good moral character to commit a sex offense against either an adult or a child. Thus, just as a witness who has formed an opinion as to a banker's character for honesty on the basis of his or her observation of the banker's handling of depositors' funds is permitted to testify to the banker's honest character if the banker faces a charge of shoplifting from a department store, so may a witness testify to a defendant's general good moral character with regard to sexual matters even if the witness's opinion does not rest on observations of the defendant under the same specific circumstances as the alleged offense.

To be sure, the prosecution would be entitled to counter such evidence with the kind of expert testimony that the prosecution in fact presented in this case, advising the jury that a person who has normal sexual relationships with adults may commit lewd and lascivious acts with a child. But the fact that the prosecution may be able to present reasons for the jury to discount the probative value of a defendant's good character evidence does not justify the trial court in excluding the evidence altogether. The majority have cited no case, and my own research has disclosed none, which suggests that a witness's testimony as to a defendant's good moral character may be

excluded unless the witness has personal knowledge of the defendant's conduct with children.

Accordingly, I disagree with the majority's conclusion that the trial court properly excluded the opinion testimony of the proffered witnesses insofar as it rested on the witnesses' observations of defendant with adults, rather than with children. In my view, defendant was entitled to present to the jury all of the good character evidence that he offered at trial.

## III

The majority correctly conclude that the trial court erred in excluding the testimony of the two female witnesses (1) that defendant was a person of high moral character, (2) that he did not have a reputation in the community for being sexually attracted to young girls, and (3) that, based on their observations of his conduct with their daughters, he is not a person who is disposed to lustful or lewd conduct with children. The majority go on, however, to hold that the error was not prejudicial. I disagree with this holding, even if the majority have correctly determined the extent of the trial court's error.

While good character evidence may be valuable to a person accused of any crime, past California cases have recognized the unique importance of good character evidence in a case such as this, in which there is no physical evidence to which an innocent defendant can point to disprove the serious child molestation charge that has been made against him and in which his vehement denial of the accusation can easily be dismissed by the jury as self-serving.

In *People* v. *Adams* (1939) 14 Cal.2d 154, 167-168 [93 P.2d 146], our court spoke at some length of the importance of scrupulously protecting the rights of an accused in a case of this nature, explaining in part: "In such a situation, the only defense available, ordinarily, to the accused is his own denial of any asserted misconduct, *together with evidence of a former good reputation*; otherwise, he is utterly defenseless . . . . Errors committed either by the prosecution or by the court in the course of the trial, which ordinarily might be considered trivial and as of no material consequence from a standpoint of adverse effect upon the rights of a defendant, may become of great importance when committed in a case of the character of that here involved." (Italics added.)

Similarly, many other cases have recognized that, in this context, evidence of an accused's good moral character may be the only evidence, in addition to his denial of the charges, that an innocent defendant can present

in his own defense (see, e.g., *People v. Anthony, supra,* 185 Cal. 152, 156; *People v. Neal, supra,* 85 Cal.App.2d 765, 771), and have emphasized that, because of the inherently inflammatory nature of an accusation of child molestation, it is required in such cases " 'that there be [a] rigorous insistence upon observance of the rules of the admission of evidence' " (*People v. Jones, supra,* 42 Cal.2d 219, 226, quoting *People v. Evans* (1952) 39 Cal.2d 242, 251 [246 P.2d 636]) and that "errors which in other context[s] might be trifling may have more serious import" (*People v. Burton* (1961) 55 Cal.2d 328, 341 [11 Cal.Rptr. 65, 359 P.2d 433]). In *People v. Stanley* (1967) 67 Cal.2d 812, 820 [63 Cal.Rptr. 825, 433 P.2d 913], our court, after referring to most of the above authorities, observed that "in a sex case where the only witness is the victim and his story is totally uncorroborated, almost any error is serious and is likely to be prejudicial."

Here, the trial court's erroneous ruling completely deprived defendant of the opportunity to present a potentially crucial portion of his defense. As a result of the ruling, the jury never learned that defendant had a good reputation in the community with regard to his sexual morality or that defendant's close friends, who had the opportunity to observe him in numerous social settings over a lengthy period of time, were of the opinion that he had a high moral character which was inconsistent with molesting a young girl. Under the cases cited above, it appears clear that the trial court's erroneous exclusion of all of defendant's evidence of his good moral character is, in itself, sufficiently prejudicial to require reversal.

Furthermore, reversal is particularly warranted here because the evidence presented at trial demonstrates that this was a much more closely balanced case than the majority opinion suggests.

To begin with, the circumstances of the incident as described by the victim, while perhaps not as "weirdly improbable" as the testimony described in *People v. Castillo, supra,* 5 Cal.App.2d 194, 195-196, 198 (see maj. opn., *ante,* p. 1312), appear unusual even within the universe of child molestation incidents. By all accounts, the events leading up to the alleged molestation of Stephanie were entirely innocent. Defendant had met Anita, Stephanie's mother, at a church dance and had dated her for several weeks prior to the day of the alleged incident. On the day in question, defendant went with Anita and her three children to Toys-R-Us to buy birthday presents for Stephanie, and then they all returned to defendant's house to play with the new gifts. After playing with the toys for some time, all five went into defendant's bedroom, where defendant's only television set was located. Defendant and Anita lay down on the bed, with the two girls on either side of them, to watch television; the young son took a nap on the floor at the foot of the bed. After a half hour or more, the young boy awoke

and his mother got up from the bed and sat with him for several minutes at the foot of the bed. According to Stephanie's testimony, it was at this point that defendant allegedly began putting his hand under her underwear, *while Anita, whom defendant was dating, was still in the room, seated only a few feet away at the foot of the bed.* Although the jury certainly was entitled to believe Stephanie's testimony in this regard, the unusualness of the alleged conduct—a molestation committed in the immediate presence of the victim's mother—could reasonably have raised at least some question in the minds of the jury as to the accuracy of the alleged victim's testimony.

Second, although the opinion maintains that the defense did not "suggest any persuasive motive for Stephanie to lie" about the incident with defendant (see maj. opn., *ante,* p. 1312), defendant's testimony at trial did suggest such a motive. Defendant testified that the incident in question was precipitated after Anita left the bedroom when Stephanie moved her arm next to his genitals as he and the two girls were lying on the bed watching television. Defendant stated that he removed Stephanie's hand and told her not to touch him there, indicating that her mother would not like that conduct. He testified that Stephanie was upset by the reprimand, left the room, and then told her mother that defendant had improperly touched her. Defendant further testified that when Anita confronted him about the incident, he described Stephanie's conduct to her and she responded, "yeah, I can believe that. She's pretty aggressive at times." Although the jury was clearly not compelled to believe defendant's testimony, his testimony provides at least a plausible explanation of why Stephanie, then nine years of age, might have lied about the incident.

Finally, there is considerable evidence which suggests that Anita may herself not have believed her daughter's version of the incident, at least initially. As the opinion recognizes, a few minutes after Stephanie reported the alleged molestation to Anita, Anita and all three children, including Stephanie, went out to dinner with defendant, and then, a week or two later, Anita went on another date with defendant in the course of which the two engaged in sexual intercourse. While it is possible that Anita would have acted in this manner even if she believed defendant had molested her daughter, her conduct at least lends some support to defendant's version of the events. In addition, Anita never reported the incident to the police. The matter did not come to light until Stephanie related the incident at school many months later, after a presentation to her class by a visiting sex-abuse-education consultant.

In light of all the evidence, I find the majority's harmless error determination clearly unsupportable. As the authorities discussed earlier make clear, even when there is no other evidence to support a defendant's denial

of an accusation of child molestation, evidence that the defendant's character is of such a nature that it would be unlikely for him to have committed the charged offense may be sufficient, in itself, to raise a reasonable doubt of the defendant's guilt. (*Michelson* v. *United States, supra*, 335 U.S. 469, 476 [93 L.Ed. 168, 174].) Particularly when considered with the other evidence in this case, the erroneously excluded good character evidence could certainly have led the jury to conclude that the prosecution had not proven defendant's guilt beyond a reasonable doubt. In a case of this nature, where the precedents teach that "almost any error is serious and is likely to be prejudicial" (*People* v. *Stanley, supra*, 67 Cal.2d 812, 820), the trial court's erroneous exclusion of a potentially crucial component of defendant's defense cannot properly be found harmless.

## IV

Accordingly, I would reverse the judgment of the Court of Appeal, and direct that court to remand this case to the superior court for a new trial.

Panelli, J., concurred.