Filed 10/8/20  P. v. Palencia CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RUDY R. PALENCIA,<br><br>Defendant and Appellant. | B298539<br><br>(Los Angeles County<br>Super. Ct. No. BA470570) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed as modified.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury found Rudy Palencia guilty of sexually assaulting his stepdaughter and his niece. The girls were children when he abused them. On appeal, he challenges the admission of expert testimony about how children may behave after someone sexually abuses them. We correct Palencia's custody credits and otherwise affirm.

Undesignated statutory citations are to the Penal Code.

I

The two victims are cousins. We refer to them by their initials to protect their privacy. (Cal. Rules of Court, rule 8.90(b)(4).) The first victim, M.R., called Palencia her stepfather. At trial, Palencia's counsel referred to M.R. as Palencia's "stepdaughter." Palencia testified he and M.R.'s mother lived together for 10 years and they were engaged but never married. The other victim, G.D., called Palencia her uncle.

The prosecution asked the trial court to admit expert testimony about "Childhood Sexual Abuse Accommodation Syndrome." The prosecution said the testimony would help the jury understand "the typical, but seemingly puzzling, behavior of a child that has been sexually abused." One example of this behavior is delayed reporting.

The court ruled on several issues before jury selection. As to the expert testimony, Palencia said, "I would object, for the record." The court overruled the objection and explained, "I do believe this is an area of law that is beyond normal knowledge of a jury, and it's ripe for an expert to come in and explain."

Witness testimony lasted two days. The prosecution offered five witnesses: M.R., G.D., two guardians of G.D., and the expert. Palencia also testified.

We summarize the pertinent testimony.

2

M.R. was 17 years old when she testified.  She recounted abuse that spanned from when she was 10 years old until she was 16 years old.  Palencia touched her inappropriately more than 10 times.  She recounted specific instances.

When she was in fifth grade and 10 or 11 years old, Palencia picked her up from school in his van.  He stopped the van near a freeway.  He grabbed her breast.  Palencia wore jeans that he had unzipped.  He put her hand on his exposed penis and he ejaculated.

The prosecution asked M.R., "Was there ever a time that he did anything inappropriate to you while you were in your bed when you were 12 years old?"  M.R. answered, "Well, not 12 years old."  She described an incident where she woke up and Palencia was on top of her.  She said that happened only once, when she was 11 years old.  Later during direct examination, M.R. said she remembered telling a detective about an incident when she was asleep when she was 12 years old.  She said the night of the incident she had taken medicine because she had been sick.  "[E]verything looked very blurry" and Palencia "looked like a shadow to me."

The prosecution also asked, "When you were about 13, did anything ever happen with the defendant that seemed inappropriate to you?"  M.R. said, "Thirteen, no."  She then said she once was showering, Palencia opened the shower curtain, and she pushed it back closed.  Palencia did not do or say anything else.  The prosecution asked if she remembered telling a detective Palencia touched her vagina after he pulled back the curtain.  M.R. said "I did say the curtain thing, but I didn't remember the vagina part."  She also explained she has been going to therapy, "so I [have] kind of been trying to leave that behind."

On another occasion when she was 12 years old, Palencia was in a truck with M.R. He covered the front windows and locked the door. Palencia pushed M.R.'s head toward his penis. She pulled back and he continued forcing her head toward his penis for a few seconds before he eventually let her go.

Another time, when she was about 13 years old and at home, Palencia forced her head to his penis and he put his penis in her mouth.

Palencia showed her his penis multiple times. He would sometimes come out of the shower, open his towel to expose his naked body to her, and smile.

When she was 16 years old, she was wearing a towel after getting out of the shower when Palencia pulled at her towel and he touched her buttocks.

M.R. spoke about the abuse in 2018. She was 16 years old, and she first told G.D., her cousin.

M.R. explained she did not tell about the abuse earlier in part because family relied on Palencia for economic stability: he paid the family's bills. M.R. feared her mother, who had given birth during the period of abuse, could not support the family by herself.

Palencia offered a theory M.R. invented the allegations of abuse to "get even with him" for taking away her cell phone. He asked whether M.R. was "making this up?" She said no. As to whether she harbored resentment about her phone, the 17 year old reflected she had used the phone poorly in the past. She said "I thank him" for taking it away.

Palencia also asked M.R. about her relationship with G.D. M.R. agreed she and G.D. were "pretty good friends" and they had been friends their whole lives. They talked on the phone and

went to the park together.  Their homes are not far from one another.

Palencia ended his cross-examination with this question: "But [before 2018] you never mentioned anything to [G.D.] about what was going on . . . [¶] . . . with Rudy Palencia?"

M.R. explained she had not told G.D. earlier because G.D. was "still living her life as a child."  M.R. did not want to burden her younger cousin with information about the abuse.

G.D. was 15 years old when she testified.  She said when she was 14 years old, she was sitting alone in Palencia's van outside another family member's house.  Palencia touched her breast, grabbed her neck, and kissed her lips.  Palencia told her he could buy her "everything."  After that, G.D. saw him touching his penis over his pants.  A family member approached the van and Palencia told G.D., "Don't say anything."  Palencia traced a heart on the window of the van.

That day, G.D. told M.R. what had happened.  For the first time, M.R. revealed Palencia had been abusing her, too.  Then they told other family members and the police.

Over Palencia's objection, Dr. Jayme Jones, a clinical psychologist, testified as an expert.  The expert had 30 years of experience and had treated hundreds of child sexual abuse victims.

The expert did not interview M.R. or G.D., did not prepare a report for the case, and did not read or review reports associated with the case.

The expert discussed "Child Sexual Abuse Accommodation Syndrome," which she explained is not a diagnosis.  Rather, this syndrome is a "model that helps us understand the behavior of children who have been sexually abused."  The prosecution asked

whether the expert used the model to determine whether a child had been sexually abused. The expert responded "no" and explained "[t]hat's not its intent, and it doesn't work in that manner."

The syndrome or model addresses certain common misconceptions. One of the five parts of the model is "delayed disclosure," which addresses the misconception a child would immediately disclose abuse.

The expert offered statistics about children's disclosure of abuse. More than half of children never disclose the abuse. Within the first year of abuse, about 10 to 15 percent of children disclose. Between one and five years, an additional 25 to 30 percent of children disclose. Between five and 10 years, about 1 to 3 percent of children disclose. Children report only a "very small percentage" of cases to law enforcement.

The expert explained the model "helps put the reasons" children do not disclose abuse "into a context." Children may not report abuse for a number of reasons. Children are most likely to speak if someone asks whether they experienced abuse, but "most people are never asked." Children may not say anything because they do not want to upset their caregivers. If children know their abusers before the abuse, there may be positive aspects of that relationship the children do not want to lose. Children may be scared to get their abusers in trouble. Children may worry people will not believe them.

The expert answered some questions about whether certain behaviors connected to the model are common among child abuse victims.

Palencia testified after the prosecution's expert. Palencia was 33 years old during trial. He denied M.R.'s and G.D.'s allegations.

The court gave the jury an instruction about how to use the expert's testimony. The instruction explained the testimony "is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [M.R.'s] and [G.D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [their] testimony."

The jury deliberated approximately an hour and a half on one day and about two and a half hours on a second day.

On April 29, 2019, the jury returned its verdict. It convicted Palencia on six of eight counts. As to the allegations involving M.R., the jury found him guilty of two counts of a lewd act against a person under 14 years old (§ 288, subd. (a)) (counts 1 and 2), one count of oral copulation of a person under 16 years old (§ 287, subd. (b)(2), former § 288a, subd. (b)(2)) (count 5), and one count of sexual battery (§ 243.4, subd. (e)(1)) (count 6). As to the allegations involving G.D., the jury found Palencia guilty of two counts of a lewd act against a child at least 10 years younger than Palencia (§ 288, subd. (c)(1)) (counts 7 and 8).

The jury found Palencia not guilty of two counts of a lewd act upon M.R. (§ 288, subd. (a)). The verdict forms for these counts specified the dates of the conduct. One count alleged conduct when M.R. was 12 years old (count 3) and the other alleged conduct when she was 13 years old (count 4). According to the prosecution's closing argument, count 3 was the allegation M.R. woke up and Palencia was on top of her and count 4 was the

7

allegation Palencia touched M.R.'s vagina when she was in the shower.

As to count 3, M.R. initially testified about an incident in her bed when she was 11 years old but she said there was *not* a time Palencia did anything inappropriate to her in bed when she was 12 years old. As to count 4, M.R. testified Palencia opened the shower curtain and did not touch her.

On May 30, 2019, the court sentenced Palencia to 12 years and six months in state prison. The sentence was composed of the following consecutive terms: the upper term of eight years for count 1; two years for count 2; eight months each for counts 5, 7, and 8; and six months for count 6.

## II

The court did not abuse its discretion by allowing the expert to testify.

Expert testimony about the common reactions of child sexual abuse victims is not admissible to show a child has been abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) The testimony is admissible, however, to disabuse jurors of common misconceptions they might entertain about how children react to sexual abuse. (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) The evidence may be used to rehabilitate a witness's credibility when the defendant suggests the child's conduct, such as delayed reporting, is inconsistent with the child's testimony alleging abuse. (*McAlpin*, *supra*, at p. 1300.)

We affirm the trial court's decision to admit expert testimony unless the defendant demonstrates a manifest abuse of discretion. (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

Palencia incorrectly says the evidence was not offered to rehabilitate either child's testimony. This indeed was one of its

8

purposes, for Palencia's cross-examination questioned M.R. about her relationship with G.D. After establishing the girls' close relationship, Palencia ended his cross-examination by asking, "[b]ut [before 2018] you never mentioned anything to [G.D.] about what was going on . . . [¶] . . . with Rudy Palencia?" The inference is plain: if the abuse were actual, M.R. would have spoken sooner. Palencia indeed did use M.R.'s delayed disclosure to challenge her credibility. The prosecution offered the expert in part to answer this challenge.

Palencia acknowledges his trial counsel questioned M.R. about her delay in reporting the abuse to G.D. He claims, however, "[s]haring information with another child does not fall within the purview of reporting misconduct to those who actually have the ability and/or authority to effectively deal with said misconduct." If we understand this claim correctly, it asserts delayed disclosures are significant only when the disclosure is to an adult. This is not so: Palencia's question sought to plant the seed of doubt about delay, and that opened the door on the topic the expert addressed. Whether Palencia framed his question as referring to a child or an adult did not affect the corrosive nature of the credibility attack Palencia had launched.

Palencia also contends the prosecution went beyond the permissible scope of expert testimony by asking improper hypothetical questions mirroring the facts of the case. He challenges the following seven questions:

    1) "So would it be uncommon for a child who has been sexually abused by, say, a close family member to remain quiet about that abuse for, say, as long as ten years, even though the child sees the person who is abusing him or her all the time?"

2) "What about . . . acting in a rebellious manner against family or friends?  Has that been something that you have observed in your practice?"

3) "[W]ould it be common for a victim -- child who is being sexually abused to go through the motions in everyday life as if everything is okay?"

4) "Within the delayed reporting -- the delayed disclosure model, would you say that it is more common than not that a report of child sexual abuse is delayed until the child is, say, a teenager or even an adult?"

5) "[W]ould it be common for a victim of child sexual abuse to block or repress memories of the abuse?"

6) "Is it common for children who have been sexually abused to forget, say, specific details about the abuse?"

7) "Is it common for children who even see each other or talk to each other often not to share details of sexual abuse with the other child or friend with whom that person has regular contact?"

Palencia forfeited these claims by failing to make a specific objection in the trial court.  (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 20 (*Demetrulias*) [requiring timely and specific objection on the ground asserted on appeal].)

On the merits, Palencia's claim fails as well.  The expert's testimony was related to one of the model's misconceptions and it served to rehabilitate M.R.  The expert identified unexpected behaviors common among child sexual abuse victims.  She then explained why children may act in these seemingly unexpected ways.  Other evidence suggested M.R. delayed reporting her

abuse. The misconceptions that can arise from delay in this context was the main thing the expert discussed. Palencia's counsel questioned M.R. about her delay in disclosing to her cousin. The trial court properly admitted this expert testimony to counter common jury misconceptions about delays in reporting abuse. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.)

It was proper for the hypothetical questions to bear some relationship to the facts of the case. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 [expert's testimony must aim at a specific myth or misconception suggested by the evidence].)

Palencia's reliance on *People v. Jeff* (1988) 204 Cal.App.3d 309 is misplaced. *Jeff* held expert testimony cannot be based on "the exact same facts and details" as those in the allegations against the defendant, because that would tell "the jury that they should accept" the victim's version of events. (*Id.* at p. 338.) Unlike the *Jeff* case, however, here neither the prosecution's questions nor the expert's responses tracked the victims' testimony so closely that they told the jury to believe the allegations. To the contrary, the expert did not purport to know or opine about the case at hand. She also explained the model is not a diagnostic tool.

The trial court took steps to ensure the testimony was not used for an improper purpose. The court instructed the jury the expert testimony was not evidence against Palencia. The jury could use the testimony only to help assess M.R.'s and G.D.'s conduct and to assess the believability of their testimony. We presume juries obey instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Palencia says the prosecution never identified the misconception the expert's testimony was designed to rebut. The

11

prosecution correctly responds it did not need expressly to state on the record the evidence inconsistent with the finding of abuse. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)  It was sufficient Palencia placed M.R.'s credibility in issue due to her delayed reporting.  (*Id.* at p. 1744–1745.)  The California Supreme Court favorably applied this reasoning from *Patino* in *People v. Riggs* (2008) 44 Cal.4th 248, 293.

Contrary to Palencia's contentions, the expert's testimony was relevant.  Palencia incorrectly claims the expert's testimony was irrelevant because M.R. had offered reasons to explain her delayed disclosure.  But a child may be reluctant to talk about abuse for many different reasons.  Different jurors may find some reasons more persuasive than others.  For example, M.R. said she endured sexual abuse because Palencia paid the family's bills.  A juror might think no amount of financial support could make a child endure sexual abuse.  The expert provided more, and relevant, testimony about why children might be slow to reveal abuse.

Palencia says the expert's testimony about rates of disclosure would have prompted the jurors to believe M.R. "on the basis of statistical probability."  Palencia forfeited this claim. (*Demetrulias*, *supra*, 39 Cal.4th at p. 20.)  The claim is also incorrect.

If anything, the expert's statistics showed the disclosure was anomalous.  The expert said only about 1 to 3 percent of children disclose between five and 10 years after abuse begins. According to these figures, M.R.'s disclosure, which came about five to six years after she said the abuse began, put her in a category where disclosure was atypical.  Additionally, M.R. and G.D. were part of the "very small percentage" of children who

12

report abuse to law enforcement at all.  The statistics tended to show the victims' actions were improbable.

Palencia challenges the use of statistics by citing *People v. Julian* (2019) 34 Cal.App.5th 878, 883–884, a case in which the expert testified about a statistical rate of false accusations.  The expert in *Julian* said that rate was between 1 and 8 percent.  (*Id.* at p. 883.)  The court reasoned these statistics invited the jury to presume there was a 92 to 99 percent chance the defendant was guilty.  (*Id.* at p. 886.)  There was no testimony like that here.

## III

Palencia says he earned three more custody credits than the court awarded.  The prosecution agrees.  We modify these credits accordingly.  A criminal defendant is entitled to credit for each day he spends in presentence custody, including the dates of arrest and sentencing.  (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; see § 2900.5, subd. (a).)  Palencia was arrested on August 15, 2018.  The court pronounced his sentence on May 30, 2019.  The court credited him with 287 days of actual credit but Palencia is entitled to 289 days.  The court credited him with 42 days of conduct credit but he is entitled to 43 days.  (§§ 4019, subd. (b); 2933.1, subd. (a) [anyone convicted of a felony listed in § 667.5, subd. (c) "shall accrue no more than 15 percent of worktime credit."].)  Thus, the judgment must be modified to reflect 289 days of actual credit and 43 days of conduct credit, for a total of 332 days of presentence custody credits.

## DISPOSITION

The judgment is modified to award Palencia 289 days of actual credit and 43 days of conduct credit, for a total of 332 days of presentence custody credits.  We direct the trial court to prepare an amended abstract of judgment to reflect the corrected

13

presentence custody credits and to forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                        WILEY, J.


We concur:



        BIGELOW, P. J.



        STRATTON, J.