Filed 3/14/24  P. v. Adkisson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>MARK ANTHONY ADKISSON,<br><br>　　Defendant and Appellant. | H050367<br>(Santa Clara County<br>Super. Ct. No. C1916767) |

A jury convicted Mark Anthony Adkisson of a lewd or lascivious act (Pen. Code, § 288, subd. (a)(1))[1] and a forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)).  The trial court sentenced Adkisson to an aggregate term of eight years in prison.  On appeal, Adkisson contends that the trial court erred by instructing the jury on Child Sexual Abuse Accommodation Syndrome (CSAAS) using CALCRIM No. 1193 (CALCRIM 1193).

For the reasons stated below, we affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Charges*

In April 2022, the Santa Clara County District Attorney filed a second amended information charging Adkisson with two counts of lewd or lascivious acts committed against Jane Doe, a child under 14 years of age, by force, violence, duress, menace, and fear (§ 288, subd. (b)(1); counts 1-2).

B. *Evidence Presented at Trial*

    1. <u>Prosecution Evidence</u>

        a. Lay Witnesses

Jane Doe was born in June 2004 to H.C., her mother, and A.L., her father.[2]  After H.C. and A.L. split up, Jane Doe lived with H.C. and Jane Doe's younger brother, John Doe, and her maternal grandmother.  H.C. met and began dating Adkisson around 2010. Adkisson moved in with H.C. and her family in or around April 2010, when Jane Doe was about six years old.

H.C. testified that Adkisson physically abused her over the course of their relationship.  Both John Doe and Jane Doe testified that, at first, Adkisson was "all right" or "very nice."  However, Adkisson later began physically abusing Jane Doe and John Doe.  Jane Doe stated that Adkisson regularly physically abused her and John Doe by slapping, punching, or choking them, or pushing them into a wall.  John Doe told H.C. that Adkisson had physically abused him, but H.C. did not believe him.  Jane Doe was afraid of Adkisson and did not tell H.C. about the physical abuse because Adkisson threatened to hurt H.C., John Doe, or Jane Doe's grandmother if Jane Doe reported it. Jane Doe believed Adkisson's threat.

---

[2] We refer to Jane Doe's relatives by their initials to protect Jane Doe's privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (11).)

According to Jane Doe, Adkisson sexually abused her approximately five or six times in the course of the time he lived with her family, including two specific instances she disclosed to H.C.

Jane Doe believes she was approximately 11 or 12 years old when Adkisson molested her for the first time, which occurred while H.C. was in the shower. That same evening, after waiting until Adkisson fell asleep and H.C. got out of the shower, Jane Doe told H.C. that Adkisson was making Jane Doe touch him and asked H.C. to make him stop. H.C. did not believe her. Instead, H.C. told Jane Doe not to tell her father about Adkisson's actions.

Adkisson molested Jane Doe again less than a year later. Jane Doe did not say anything about this second incident right away because she was afraid of angering Adkisson, noting that if Adkisson got mad, "[h]e would hit [her and her brother]" and because H.C.'s response to Jane Doe's first disclosure made Jane Doe feel "there was no use in telling her [mother] again." A few months later, Jane Doe did tell H.C. that Adkisson was again making Jane Doe touch him inappropriately. H.C. did not believe Jane Doe, which hurt and saddened her.

Jane Doe never told her grandmother about Adkisson hurting or touching her and denied it when her grandmother would ask. Jane Doe did not disclose the abuse to her grandmother because she "didn't want her [grandmother] to be upset or be disappointed in some type of way" and felt her grandmother "would get upset with [Jane Doe] for not speaking out or upset with [H.C.] [for] not kicking [Adkisson] out sooner." Jane Doe denied that social workers asked her about Adkisson sexually abusing her.

On or about March 24, 2015, Adkisson was arrested—and later convicted—of a domestic violence battery causing injury to H.C. (§ 273.5).[3] Adkisson left and did not move back into H.C.'s home.

---

[3] The parties stipulated to this fact.

Jane Doe later went to live with her father, A.L.  In June 2019, she told her father about Adkisson sexually abusing her.  A.L. called the police.

b.  Expert Witness

At trial, the prosecution called Dr. Anna Washington, a licensed psychologist at the University of California, Davis CAARE (Child and Adolescent Abuse Resource and Evaluation) Center, to testify as an expert witness on CSAAS.

Dr. Washington explained that the concept of CSAAS originated with an article written by Dr. Roland Summit in the early 1980s and was intended to educate people about myths and misconceptions relating to the way victims of child sexual abuse should react or disclose information after being abused.  Dr. Washington discussed the five components of CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, or unconvincing disclosure; and recantation or retraction.  She stated that not all of the five components are observed in every child sexual abuse victim.

With respect to the second CSAAS component, helplessness, Dr. Washington testified that this component responds to "the myth that children should fight off" the perpetrator of the sexual abuse "or scream or run away right away."  Dr. Washington explained that the helplessness a child feels may be exacerbated if the perpetrator "spends a lot of time in" the child's home and if the child discloses the abuse to someone they trust and is not believed.[4]

In relation to the helplessness component, Dr. Washington stated that children, "because of their developmental stage, have difficulties conceptually understanding time."  As a result, "things like date and time as well as length of time can be difficult for

---

[4] According to Dr. Washington, "if children get the perception that no one will help them, then they're less likely to disclose," and "if they tell someone and that person doesn't believe them or doesn't intervene, then that child is less likely to continue to share."

a child to understand as well as report on," including, in the child sexual abuse context, accurately reporting when and at what age the sexual abuse occurred.

With respect to the third CSAAS component, entrapment and accommodation, Dr. Washington testified that, since child sexual abuse tends to be "chronic," the child may develop "coping strategies" because they know the abuse is "likely to continue" and "they don't know how to stop it." Such coping strategies could include compartmentalizing, which allows the child "to function pretty well" while experiencing abuse, such that "other people may not notice that something is wrong."

With respect to the fourth CSAAS component, delayed, conflicted, or unconvincing disclosures, Dr. Washington explained that this component addresses the misconception that children should discuss the sexual abuse right away after it happens and consistently over time. However, the reality is that children who are sexually abused may delay disclosure by months or years, or may never tell anyone at all. Dr. Washington testified that there are a number of reasons for delayed disclosure. The child may worry about potential negative consequences of disclosure, such as "being placed in foster care, breaking up the family, [and/or] impact[ing] [] siblings"; think people will not believe them or view them differently; or be so overwhelmed by the enormity of the abuse they are suffering that "they just don't want to think about it or talk about it." Dr. Washington also stated that children may make "incremental disclosures," and, "[i]f people believe them and support them and nothing terrible happens," they may then "continue to share about what happened." However, "if people don't believe them or they [] see some negative consequence," such as people getting angry with them, "they might shut down and not share any more information."

Dr. Washington explained that CSAAS is not a diagnostic tool, so you cannot take information about someone, "plug it into the CSAAS framework," and "decide whether they're actually a victim" of child sexual abuse. Therefore, CSAAS is "not used to determine whether a child has been sexually abused or not."

5

Dr. Washington did not know the charges against Adkisson, review any police reports or transcripts, interview any of the witnesses, or hear or review any of Jane Doe's testimony. She was not in court to provide an opinion about whether Jane Doe was sexually abused, and she reiterated on redirect that her role "is not to make a determination of whether or not a child was sexually abused or not."

2. Defense Evidence

At trial, Adkisson introduced the testimony of two social workers who interviewed Jane Doe and John Doe pursuant to referrals alleging neglect and/or abuse.

Evelia Haro was a social worker with Santa Clara County in 2011 when she interviewed Jane Doe and John Doe in their home following a referral for child neglect, physical abuse, and emotional abuse. Jane Doe appeared to be happy and healthy during the interview. When Haro screened Jane Doe for sexual abuse, Jane Doe did not say that anyone was physically or sexually abusing her.[5] When Haro had a conversation with Jane Doe about what Jane Doe would do if somebody touched her inappropriately, Jane Doe "said she would tell her mother, father, grandma, if someone was hurting her."

Andres Andrade was an emergency response social worker with the Santa Clara County Department of Family and Children Services in 2015 when he interviewed Jane Doe, then 10 years old, at her school as part of an investigation into claims of physical abuse perpetrated by Adkisson against both Jane Doe and John Doe.[6] Jane Doe told Andrade about Adkisson physically abusing her, including covering her mouth, slapping her, and grabbing her neck and choking her. However, when Andrade briefly conducted

---

[5] Haro screened for risk factors, such as sexual abuse, because she was interviewing Jane Doe in connection with a physical abuse allegation.

[6] Andrade was not there to investigate sexual abuse, and the interview lasted no more than 10 to 15 minutes.

a sexual abuse screening, Jane Doe denied that "anyone had ever touched her inappropriately or in a way that made her feel uncomfortable."**7**

Adkisson testified and denied physically abusing and sexually abusing Jane Doe.

During closing argument, defense counsel argued Jane Doe's testimony was not credible given the number of times she had told different people she had never been sexually abused.

C. *Jury Instructions*

In addition to standard instructions on evaluating witness testimony and considering evidence admitted for a limited purpose, the trial court issued the instruction at issue here, CALCRIM 1193. It read, "You have heard testimony from Dr. Anna Washington regarding child sexual abuse accommodation syndrome. [¶] Dr. Washington's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. As the jury, you must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] You may consider Dr. Washington's testimony only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of Jane Doe's testimony."

D. *Jury's Verdict and Adkisson's Sentence*

The jury returned a not guilty verdict on count 1, forcible lewd or lascivious act on a child under 14 (§ 288, subd. (b)(1)), a guilty verdict on the lesser included offense of lewd or lascivious act (§ 288, subd. (a)), and a guilty verdict on count 2, forcible lewd or lascivious act on a child under 14 (§ 288, subd. (b)(1)).

The trial court sentenced Adkisson to an aggregate term of eight years in prison.

---

**7** Andrade testified that, when responding to referrals, emergency response social works "briefly check with children about different risk factors," including screening for sexual abuse.

Adkisson appealed.

## II. DISCUSSION

Adkisson contends the trial court erred in instructing the jury with CALCRIM 1193 because it misstates the law regarding the application of CSAAS evidence and improperly allows jurors to use such evidence to determine if he sexually abused Jane Doe, thereby reducing the prosecution's burden of proof and violating Adkisson's constitutional rights.[8]

### A. *Legal Principles*

"While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred," California courts have long held such evidence admissible in child sexual abuse cases to "disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Such evidence is needed " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*); see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["The purpose of CSAAS is to understand a child's reactions when they have been abused."]) and, thus, "it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, at p. 171.)

Expert testimony regarding CSAAS "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation."

---

[8] Although Adkisson's trial counsel did not object to the giving of the challenged instruction, the Attorney General concedes the issue is not forfeited on appeal. We review the merits of Adkisson's claim because he contends the instruction affects his substantial rights. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.) Because we consider Adkisson's claim on the merits, we need not address his alternative claim of ineffective assistance of counsel for his trial counsel's failure to object to CALCRIM 1193.

(*McAlpin*, *supra*, 53 Cal.3d at p. 1300; see also *Gonzales*, *supra*, 16 Cal.App.5th at p. 503.)

We review a claim of instructional error de novo to ascertain whether the instruction accurately states the applicable law. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218 (*Ramirez*).) In doing so, we consider the challenged instruction in the context of all the instructions given to the jury and the trial record, not in isolation. (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816 (*Ortiz*).) We assume that jurors are intelligent and capable of understanding the instructions. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 915.)

B. *Analysis*

California courts have upheld the language of CALCRIM 1193 as accurately informing the jury of the limited use of CSAAS evidence. (See *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Gonzales*, *supra*, 16 Cal.App.5th at p. 504; *Ortiz*, *supra*, 96 Cal.App.5th at p. 816; *Ramirez*, *supra*, 98 Cal.App.5th at p. 219; *People v. Munch* (2020) 52 Cal.App.5th 464, 474.)

While Adkisson does not dispute the correctness of most of CALCRIM 1193, he contends the last sentence misstates the law and contradicts the rest of the instruction. Adkisson maintains that (1) "it is impossible to evaluate the believability of the complaining witnesses without evaluating whether their molestation allegations are true"; (2) "[t]he double negative phrase 'not inconsistent with' " in the last sentence of the instruction "means the same thing as 'consistent with' " and, as such, if the jury concluded that "Jane Doe's conduct was 'consistent with' those of sexual abuse victims," they would necessarily believe her claims were true; and (3) the last sentence of CALCRIM 1193 is impermissibly weighted in favor of the prosecution "because it expressly permits jurors to use CSAAS evidence to determine if the complainant's behavior is consistent with that of a sexual abuse victim, but ignores the defensive inference that the same behavior might suggest falsity."

9

We are not persuaded by Adkisson's argument or that the existing precedent is incorrectly decided.

The language of CALCRIM 1193, read as a whole, belies Adkisson's claim. The instruction expressly told the jury that Dr. Washington's testimony regarding CSAAS "is not evidence that the defendant committed any of the crimes charged against him" and could be used only for the stated limited purposes. Thus, CALCRIM 1193 explicitly precluded the use of the proffered CSAAS evidence "to conclude inferentially from [Jane Doe's] conduct and Dr. [Washington's] testimony" that Adkisson committed the charged crimes. (*Ortiz*, *supra*, 96 Cal.App.5th at p. 816.) The inclusion in CALCRIM 1193 of an instruction that the jurors could not consider CSAAS evidence as proof that Adkisson committed the charged crimes would not provide any reasonable juror grounds to believe the CSAAS evidence could be used in the way Adkisson suggests. "We presume the jurors understood and followed the instructions." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

The last sentence of the instruction, which is the focus of Adkisson's argument on appeal, does not compel a contradictory conclusion that Jane Doe's conduct was consistent with being a sexual abuse victim. That the behavior of an alleged victim is not inconsistent with having been a victim of sexual abuse does not necessarily mean the alleged victim's conduct is inevitably consistent with such victimization. (*Ortiz*, *supra*, 96 Cal.App.5th at p. 816.) Moreover, although the assessment of an alleged sexual abuse victim's "believability" may assist the jury in determining whether to credit the victim's testimony that the abuse occurred, the same can be said of any evidence that is admitted as relevant to a witness's credibility.

In addition, the instruction must be understood in the context of the trial record, including Dr. Washington's expert testimony regarding CSAAS (see *Gonzales*, *supra*, 16 Cal.App.5th at p. 504) and defense counsel's arguments that Jane Doe's conduct was inconsistent with her testimony (see *Lapenias*, *supra*, 67 Cal.App.5th at p. 175).

10

Dr. Washington testified that CSAAS is neither a diagnostic tool used to determine whether a child was sexually abused nor meant to prove that an allegation of child sexual abuse is true. Dr. Washington also stated, both on direct and cross-examination, that she had not met Jane Doe, did not evaluate Jane Doe, did not know the facts of the case, and was not opining on whether Jane Doe was actually victimized. Her testimony was stated generally and described behavior common to child sexual abuse victims as a group, rather than any individual victim, including Jane Doe.

When combined with Dr. Washington's testimony emphasizing the limited nature of her statements regarding CSAAS, CALCRIM 1193 is unlikely to cause a reasonable juror to believe that they could consider the proffered CSAAS evidence as proof that Adkisson sexually abused Jane Doe.

Furthermore, during cross-examination of Jane Doe, defense counsel questioned Jane Doe's lack of disclosure to her grandmother and to the social workers. During closing argument, he sought to undermine Jane Doe's credibility by contending that her lack of prior disclosure was evidence that Jane Doe's testimony regarding the sexual abuse was unreliable.

CALCRIM 1193 appropriately instructs jurors that CSAAS evidence is relevant and may be used to consider a child sexual abuse victim's credibility when the defense attacks it based on behavior which appears inconsistent with their testimony claiming molestation. (*Ramirez*, *supra*, 98 Cal.App.5th at pp. 214–215, 219–220; see also *McAlpin*, *supra*, 53 Cal.3d at p. 1300.) The jury could properly refer to Dr. Washington's testimony regarding CSAAS—including its third (entrapment and accommodation) and fourth (delayed, conflicted, or unconvincing disclosures) components—to understand Jane Doe's demeanor during the investigation by Haro and Jane Doe's decision not to report Adkisson molesting her to her grandmother and the social workers.

A reasonable juror would understand the instructions in CALCRIM 1193 to mean that they could—but were not required to—consider Dr. Washington's testimony

regarding CSAAS in deciding that Jane Doe's apparently inconsistent disclosures and behavior do not mean she lied when she said Adkisson sexually abused her. The CSAAS evidence "simply neutralizes" Jane Doe's seemingly self-impeaching conduct and testimony. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.) "Thus, under CALCRIM [] 1193, a juror who believes [Dr. Washington]'s testimony will find both that [Jane Doe]'s apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid*.)

We decide that it is not reasonably likely that the jurors concluded from the instruction that they could use Dr. Washington's expert testimony on CSAAS as affirmative proof supporting the truth of the charges or to lessen the prosecution's burden to prove Adkisson's guilt beyond a reasonable doubt. We therefore decide that the trial court did not violate Adkisson's constitutional rights by giving the instruction.[9]

## III. DISPOSITION

The judgment is affirmed.

---

[9] Because we find no error in the giving of CALCRIM 1193, we do not address Adkisson's assertion that alternative instructions, namely CALJIC No. 10.64 and an instruction previously used in New Jersey, more "accurately express[] California law regarding CSAAS."

_____
Danner, J.

WE CONCUR:



_____
Greenwood, P. J.




_____
Bromberg, J.




**H050367**
*People v. Adkisson*