Filed 12/29/25  P. v. Smith CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TAMELL LOUIS SMITH, <br><br> Defendant and Appellant. | F088376 <br><br> (Super. Ct. No. F15902752) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant Tamell Louis Smith of multiple charges—sexual intercourse or sodomy with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); counts 1–6), attempted sexual intercourse or sodomy with a child 10 years of age or younger (§§ 288, subd. (a)(7), 664; count 7), and lewd acts upon a child under the age of 14 (§ 288, subd. (a); counts 8–9)—related to his sexual abuse of several children. (Undesignated statutory references are to the Penal Code.)  During trial, a licensed psychologist testified as an expert on child sexual abuse accommodation syndrome (CSAAS).

In his sole issue on appeal, defendant contends his convictions should be reversed based on the admission of CSAAS evidence.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 1–6), attempted sexual intercourse or sodomy with a child 10 years of age or younger (§§ 288.7, subd. (a), 664; count 7), and lewd acts upon a child under the age of 14 (§ 288, subd. (a); counts 8–9)—related to his sexual abuse of multiple children, including his daughter.  Before trial, the prosecution moved to admit CSAAS testimony through an expert, Dr. Jason Christopherson.  The defense moved to preclude such testimony, noting cases that hold expert testimony is inadmissible to prove a child had been molested.  The court noted it was "somewhat circumspect in allowing CSAAS evidence," and its practice was to decide admissibility after the complaining witnesses testified and it comes down to, "in large part, an Evidence Code section 352 analysis."  Accordingly, it deferred ruling on the request.

H.P., who was 21 years old at the time of trial, testified that when she was approximately four years old to seven or eight years old she lived with her mother in Bakersfield.  H.P.'s aunt C.B. lived in Fresno.  H.P. and her family went to stay at her

2.

aunt C.B.'s house on July 4, 2009. Defendant, who was C.B.'s boyfriend or husband at the time, was also there. H.P. recalled sleeping on the floor in the living room. She woke up and defendant was at her left side, close to the ground. He was touching H.P. with his hands on her vagina, "[p]ossibly inside" but she could not exactly recall. H.P. was physically and emotionally "uncomfortable" and confused. At some point, defendant stopped and went back upstairs. H.P. did not call out to anyone. She was not sure why but thought she did not know "anything was wrong." H.P. testified that defendant touched H.P. again on another occasion in C.B.'s house that same year. H.P. was playing in her cousin I.T.'s room with I.T. and H.P.'s younger sister. H.P. was bent down inside the closet getting something and defendant came in "pretending to help." H.P. was wearing a dress and underwear and defendant pulled down her underwear and he inserted his penis inside H.P. H.P. recalled it "being painful." H.P. was "pretty sure it was [her] vagina" but she did not know the difference between her anus and vagina well when she was so young. H.P. did not "really understand what was happening or why." It lasted maybe a minute or two and then defendant left the room. H.P. testified that defendant pulled up her underwear. She did not recall saying anything to defendant.

On another occasion, H.P. was sleeping alone in a bed in I.T.'s room. I.T. and H.P.'s sister were sleeping in the room too. H.P. woke up and defendant was on top of her, undoing her pants. H.P. could not remember what happened after that. However, she recalled lying next to her mother "scared, in pain," her "private area was in pain." Her mother was asleep and did not wake up. H.P. testified she believed all three incidents happened in 2009. H.P. eventually told her mother about what happened to her when they moved to Nevada when she was seven or eight years old. H.P. gave a statement to law enforcement about what had occurred. A recording of H.P.'s interview was played at trial, which occurred when H.P. was eight or nine years old. During the interview, H.P. reported that she went to her aunt C.B.'s house on New Year's Eve when she was around four and defendant was there. She was sleeping on the floor in the living room with her

3.

two cousins and she woke up because defendant was touching her under her clothes, pushing with his hand on her "private." Another afternoon, defendant was painting and he put his "private part" in H.P.'s "private part" for 30 minutes or longer and then he stopped because he was scared somebody would find out. On another occasion, H.P. was sleeping in I.T.'s room in the bed and she woke up because she felt something. Defendant was putting his "private" in hers. Defendant once told H.P. not to tell anyone or he would hurt her. H.P. reported that she finally told her mom, and her mom took H.P. to the doctor.

D.B. testified at trial that defendant's ex-girlfriend, C.B., is her sister. D.B. was 24 years old at the time of trial and C.B. was approximately 10 years older than D.B. When D.B. was eight to 10 years old she would visit C.B. at her house in Fresno and spend the night maybe once a year. Defendant lived with C.B. at the time. D.B. recalled falling asleep on C.B.'s couch with C.B. behind her. She woke up and felt someone "touching [her] butt inside [her] pants." Defendant was lying behind her and she could hear him breathing. He touched her "butthole" with his finger for less than a minute and then removed his hand from her pants. D.B. did not call out for C.B.; she was scared. At some point, D.B. fell back asleep. She woke up in the morning alone on the couch. She did not tell anyone because she did not think anyone would believe her because she was a kid.

D.B. reported defendant touched her on another occasion when she was approximately 10 years old. D.B. and five other girls were sleeping on the floor in a circle in I.T.'s room. D.B. was sleeping and she woke up to defendant reaching inside her shirt, feeling her chest and touching her left breast under her bra. D.B. opened her eyes and saw defendant "going around the circle." She did not say anything because she was scared. She saw defendant approach her younger sister and D.B. closed her eyes. D.B. disclosed the abuse when she went to a doctor's appointment to obtain birth control when she was 15.

4.

Defendant's daughter A.S. also testified. She was 22 years old at the time of trial. A.S.'s mother was with defendant when A.S. was young but at some point they separated when A.S. was four or five. Defendant moved in with C.B. A.S. would go visit defendant at his and C.B.'s house on some weekends and spend the night there. At some point A.S.'s relationship with defendant changed. He would make her "do things" like take baths with him or do sexual things. A.S. testified she started taking baths with defendant when she first visited him at C.B.'s house. When A.S. was in elementary school, defendant shook her awake and had sex with her. He pulled down A.S.'s pants while she was laying on her back and inserted his penis into her vagina. He whispered to her, "I love you," and not to tell anyone. A.S. testified that "[i]t hurt" and she "was just trying to block it out." When defendant stopped, he pulled up his pants and left. A.S. did not tell C.B. what happened because she was embarrassed. She said this happened more than twice, always at night and she believed it happened more than five times. Sometimes she was sleeping in I.T.'s room and defendant would pick her up and take her to the living room and then have sex with her. When he stopped, he would carry her back to the bedroom. She would still hurt the next morning and noticed blood on her underwear when she went to the restroom. A.S. told her mother about what happened when she was nine because she wanted it to stop. A.S. was in the restroom and crying. A.S.'s mother called the police and took A.S. to the hospital. A doctor examined A.S.'s "private area." (Boldface omitted.)

A.S. was interviewed about the abuse when she was nine. The multi-disciplinary interview center (MDIC) interview took place on September 14, 2011, and a recording of the interview was submitted as an exhibit at trial. During the interview, A.S. reported that defendant had sex with her on two different occasions and that she told her mother after the second time. A.S. reported she was nine years old and in the fourth grade the first time it occurred. She was in the living room watching television and defendant picked her up and took her to his room. Defendant took off her clothes and put his "thingy" in

her "private." A.S. said she felt sad and she was scared of defendant. She reported that it happened a second time about a month later. A.S. was sleeping and defendant again carried her to his room while everyone else was in the living room. He took off her pajamas and "put his thing in there" again. A.S. told her mother after the second time that "he put his thingy in there" because she was scared that it would happen again. Her mother took her to the doctor. She did not report it the first time because she was scared.

I.T., who was 19 years old at the time of trial, also testified. I.T. grew up with her mother, C.B., and did not have a relationship with her biological father. I.T. used to refer to defendant as her stepdad. Defendant and C.B. lived together and defendant had been in I.T.'s life since she could remember. I.T. thought defendant was her dad.

At some point, before defendant stopped living with them, C.B. asked I.T. if defendant had ever touched her. I.T. said, "[Y]es." It happened more than once. I.T. remembered an incident that occurred in the living room of their apartment in Fresno on Christmas Eve when she was five years old. I.T. was sleeping and defendant woke her up. He told her "[she] had bugs in [her] butt" and "he had to get them out" and "[she] had to let him." He told her he would let her open a present if "[she] let him get the bugs out." Defendant "put his private part into [her] butt, but not all the way." Once he stopped, he told I.T. she could open a present. She did not tell her mother the next day because she "didn't know it was wrong" or that she "was supposed to." Another time, when I.T. was four or five and C.B. was not home, defendant called I.T. into his room. Defendant had no clothes on and was watching television with "[n]aked people." He asked I.T. if she wanted to touch him anywhere and he "was rubbing his private part as if he wanted [her] to . . . touch that part." I.T. touched defendant's private part for a few minutes while he laid on the bed. She stopped because she felt uncomfortable. On another occasion when I.T. was four or five, she was taking a bath with her cousin H.P. Defendant came in and told them to make sure they cleaned themselves right or he would do it, and I.T. explained to H.P. that meant they would have to go in the room with no

6.

clothes on.  I.T. remembered going to the bedroom with no clothes on; defendant was there and the door was closed, but she did not recall what happened.  She remembered defendant putting his foot in her vagina and moving it around when he was sitting on the couch in the living room and she was sitting on the couch near his feet.  She felt uncomfortable so she got up.  I.T. was five years old when this occurred.

In October 2011, an MDIC interview was conducted with I.T. who was six years old at the time.  A recording of the interview was played for the jury.  During the interview, I.T. reported that defendant touched her "private part" more than five times.  She stated it happened first when she was three years old at the "apartment house."  Defendant touched her "private" with "his private" and "rubb[ed] it back and forth" in her mother's room.  Defendant told her, " 'Don't tell anybody or I'll go to jail.' "  I.T. stated defendant "tried to put his private inside [her] butthole" when she was five on Christmas but she did not let him.  She stated he tried to put his "private in [her] butt" more than one time but she would not let him.  She reported that the last time defendant touched her "private" she was six years old and her mother had gone to work.  Defendant "put . . . his private on [hers]."  I.T. said she told her mother when she was six because she did not want to get in trouble.

C.B. testified she was in a relationship with defendant for six years.  There were times when they were on and off again and at some point they got married.  Ultimately, C.B. filed for divorce.  C.B. had her daughter I.T. before she met defendant.  I.T. was five or six months old when C.B. and defendant started dating.  Defendant and C.B. started living together approximately three to six months into dating; I.T. lived with them.  C.B. and defendant had two biological children together.  C.B. testified defendant's other biological children, J.S. and A.S., would visit and stay with them.  They would either sleep in the living room or in I.T.'s room.  C.B.'s niece H.P. visited them with H.P.'s mother over Fourth of July.  C.B. testified I.T. did not tell her on her own that defendant did anything bad to her.  Rather, six months to a year after C.B. filed for divorce, when

I.T. was five years old, C.B. talked to her.  C.B. had received a call from A.S.'s mother, which prompted her conversation with I.T.  C.B. went to speak with I.T. in her bedroom and asked her if anyone was touching her "private area" and she pointed to her crotch area.  I.T. said, "[Y]es."  C.B. asked her, "Who?"  I.T. said, "Dad," referring to defendant.  C.B. took I.T. to the hospital and made a report to the police.

Sergeant D. Wilkin with the Fresno Police Department sexual assault unit testified he was previously a detective and was assigned to defendant's case.  He interviewed D.B. as part of his investigation.  He located defendant and provided defendant his *Miranda*[1] warnings.  Defendant wanted to speak to Wilkin.  Defendant stated he had not seen his daughters in four years, but that changed during his statement.  Wilkin told defendant what D.B. reported defendant had done.  Defendant stated he "could have touched her on accident, but didn't elaborate as to what that meant."  Wilkin asked defendant if there was any reason why they would find defendant's DNA on D.B.'s bra.  Defendant stated she was small and not wearing a bra so they would not find DNA on the bra.  Defendant did not admit to touching D.B. but he also did not disagree that she was not lying.  He never admitted to touching I.T., H.P., or A.S.

After the court held such testimony admissible, licensed psychologist Dr. Jason Christopherson testified as an expert on CSAAS on behalf of the prosecution.  He explained that CSAAS is "like an organized series of patterns of behavior that children who are victims of sexual abuse will engage in and the patterns were put into an article by a mental health psychiatrist back in 1983."  The behaviors included secrecy, helplessness, entrapment, accommodation, delayed unconvincing disclosures, and recanted disclosures.  This was meant to dispel myths about the ways in which children will act if they are victims of child sexual abuse.  Christopherson testified that in his work as a therapist for children over the years he had observed some of these patterns.  He

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

explained that secrecy "refers to the tendency for children to be secretive about things" and to maintain secrets for a long period of time. He testified there is a pattern of keeping a secret about being a victim of abuse. Helplessness refers to "the idea that children often perceive themselves to be somewhat powerless . . . in a lot of situations." "[P]eople either may not believe them or they're having trouble advocating for themselves or there are threats that are being made either to them or others. And so, oftentimes, for many different reasons, such as to avoid being punished, to avoid getting in trouble, they perceive themselves to be in sort of a helpless situation." Entrapment/accommodation are "two terms talking about a similar psychological process." They refer to the idea that children who are victims of abuse "are not equipped to handle these kinds of situations, so they often feel trapped and they don't know what to do." "[C]hildren will oftentimes accommodate the abuse or the abuser for long periods of time. They might even seek out the person."[2] Christopherson noted that "every single case of a child who was a victim of sexual abuse is highly individual and the factors were very different. While there are patterns and similarities, not every person displays every pattern, not every person displays every symptom or behavior, but these are things that are common to a lot of cases despite the fact that there are very many specific individual differences." Additionally, CSAAS was not intended to be used as evidence for or against something, it was intended as an educational organization tool "to explain why children behave in ways that don't make sense to adults" and to teach the mental health treating community common behaviors in children who are victims of sexual abuse. Delayed or unconvincing disclosures was the fourth pattern in CSAAS. With regard to "delayed or unconvincing disclosures," Christopherson testified "one thing that we see as a general pattern in children who are the victims of sexual abuse is that they will often

---

[2] At this point in the testimony, defense counsel objected on Evidence Code section 352 grounds with regard to the discussion of entrapment. The court overruled the objection.

9.

disclose the relationship a very long time afterwards, it could be months, it could even be years, sometimes it could be decades. And so delayed disclosure has to do with waiting a long period of time. The unconvincing component of that is related to the manner in which children disclose being the victim of sexual abuse is often unconvincing because when we think about childhood memory, neurology, this whole dissociation factor, all of those things play a role in the idea that children will mix up details, children will forget important details. And so it makes it hard for an adult who's having a conversation with a child to get this . . . logical coherent narrative about something." Incremental disclosure is a process by which children commonly disclose either different parts to different people or they only disclose little bits to people over a long period of time. Retracted or recanted disclosure is the final element or category or pattern and refers to the fact it is not uncommon for child victims of sexual abuse to recant their disclosure. Christopherson testified he had received no information in this case other than the case name, department number, and date and time he was supposed to be there. He did not know the victims in this case or the charges. He did not opine on whether any of the complaining witnesses had been subjected to sexual abuse.

Following the conclusion of Christopherson's testimony, the court admonished the jury as follows:

> "Child Sexual Abuse Accom[m]odation Syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accom[m]odation syndrome is offered only to explain certain behaviors of an alleged victim of child sexual abuse. Dr. Christopherson's testimony about Child Sexual Abuse Accom[m]odation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not . . . the complaining witness or victims in this case's conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of alleged victims."

The defense did not present any witnesses.

10.

Following the presentation of evidence, the jury found defendant guilty as charged of two counts of sexual intercourse or sodomy with a child 10 years of age or younger as to A.S. (§ 288.7, subd. (a); counts 1–2), three counts of sexual intercourse or sodomy with a child 10 years of age or younger as to H.P. (§ 288.7, subd. (a); counts 3–5), one count of sexual intercourse or sodomy with a child 10 years of age or younger as to I.T. (§ 288.7, subd. (a); count 6), one count of attempted sexual intercourse or sodomy with a child 10 years of age or younger as to I.T. (§§ 288.7, subd. (a); 664, count 7), and two counts of lewd acts upon a child as to D.B. (§ 288, subd. (a); counts 8–9). The court sentenced defendant to consecutive terms as follows: seven years (the middle term) as to count 7; two years on count 8 (one-third the middle term); two years on count 9 (the middle term); and six terms of 25 years to life for counts 1, 2, 3, 4, 5, and 6.

## DISCUSSION

In his sole issue on appeal, defendant challenges the admission of CSAAS testimony, arguing it was erroneously admitted and resulted in reversible error. We disagree.

**Relevant Factual Background**

After all four victims testified, the prosecution asked the court to rule on the motion in limine to admit evidence of child abuse accommodation syndrome or CSAAS through their expert, Dr. Christopherson. The prosecutor asserted such evidence was "for the limited purpose of explaining some of the myths of sexually abused children and to show that the victims' reactions are not inconsistent with having been abused." The prosecutor argued there were "multiple ways in which the Defense attacked the credibility of all of the victims. Most notably . . . was the delayed disclosure . . . not reporting right away. Oftentimes during defense cross-examination . . . a lot of questioning was, 'Well, when did you tell your mom?' 'Why didn't you tell your mom?' 'Why did you, . . . essentially keep interacting with [defendant],' which also dovetails

11.

into entrapment." To that end, "another one of the categories of this syndrome and the myth that tends to explain entrapment being . . . that a victim may be sexually abused or molested and maintain a seemingly normal relationship with the abuser such as continuing to interact with him, which is something that all four of the victims did." The prosecutor also argued the concept of "[i]ncremental disclosure being that a victim may disclose to mom and say, 'I was molested by step dad' and nothing else. And then when interviewed by the police may say, 'I was molested by step dad five times,' and slowly over time incrementally discloses. That was attacked pretty heavily with [I.T.] as well as [D.B.] . . . as well as [A.S.] and [H.P.]." The prosecutor argued the expert testimony was applicable on these bases and that the court could give CALCRIM No. 1193 to remedy any concerns.

Defense counsel argued, with regard to entrapment, there were no questions on cross-examination to attack that the victims continued to interact with defendant. She asserted "that's presumed from their testimony and that might be a question for the jury." She also argued with regard to incremental disclosure, "the disclosures of the victims were attacked due to their inconsistencies in the statements that they gave in their MDICs back in 2011 and then the testimony provided in court." She asserted the victims were attacked "due to the credibility and the inconsistencies in the incidents, not them continuing to . . . disclose additional incidents." As to delayed disclosure, defense counsel admitted H.P. and D.B. were attacked based upon the delay in disclosure but as to A.S., "she did disclose in a timely fashion." She also argued, with regard to entrapment, the "[d]efense did not attack [A.S. and I.T.] as to why . . . they were scared of their father and wanted to go back. . . . [T]hat was provided . . . by the People on direct examination."

The court explained that it was "somewhat circumspect in allowing the testimony of Child Sexual Abuse Accom[m]odation Syndrome experts." It explained "the circumspection has drawn the scrutiny of our Court of Appeal," noting in *People v.*

*Sedano* (2023) 88 Cal.App.5th 474 (*Sedano*), our court stated it "may have an overly conservative view of the application of Child Sexual Abuse Accom[m]odation Syndrome or the prohibiting of certain aspects of the testimony of the expert, more specifically as it pertains to numerical percentages." The court explained it thought "not all cases involving child sexual abuse may merit the testimony of an expert witness in this regard. And that's why it's the practice of the Court to wait and listen to the evidence to establish whether or not there is any suggestion that the child's conduct after the incident such as delay in reporting, for instance, is inconsistent with his or her testimony. And [d]efense conceded or acknowledged that there had been some delay in reporting and some attacking on maybe examining certain witnesses in that regard." The court explained, this has made the issue probative under Evidence Code section 352 "because there was evidence for which an expert could dispel any misconceptions of this jury, it could assist them, that is the factfinder, in determining why certain aspects of the testimony might seem inconsistent with what they alleged to have occurred." Accordingly, the court granted the People's request to admit expert testimony on CSAAS. The court noted "that we don't present evidence or give an inference that this evidence will be admissible to prove that the complaining witnesses have, in fact, been sexually abused. But it only as [*sic*] admissible to rehabilitate any credibility that's been attacked such as . . . inconsistent testimony for . . . delay in reporting, for instance[,] so that we can disabuse the jury of this misconception in child sexual abuse cases," and also to explain "some of the children's seemingly self-impeaching behavior."

**Applicable Law**

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*); see *People v. Jones* (2013) 57 Cal.4th 899, 946.) Additionally, " 'the admissibility of expert opinion is a question of degree. The jury need

13.

not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." (*McAlpin*, at pp. 1299–1300.)

Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in "evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see *Sedano*, *supra*, 88 Cal.App.5th at p. 479; see also *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; see generally *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 (*Bowker*).) CSAAS testimony is permitted " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,' " such as delayed disclosure of the abuse. (*McAlpin*, at p. 1301; see *Sedano*, at p. 480; *Lapenias*, at p. 172.) An expert's explanation of CSAAS "is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300; see *Sedano*, at p. 479.)

**Analysis**

Defendant asserts there is a "robust line of cases in other jurisdictions disapproving use of CSAAS evidence as inherently unreliable." He argues "competing scientific studies on particular components shows the relevant expert community is not in accord, but in disagreement, meaning CSAAS is not so widely accepted that courts may

permit its wholesale admission under *Kelly/Frye*."[3]  He contends, here, the court abused

its discretion admitting the CSAAS testimony, apart from delayed disclosure, because it

was "generally irrelevant such that its specific prejudice cannot be overcome by either a

general assertion of probity or its probity only in part."  He argues, "to the extent the

relevant research was necessary to dispel some misconception about delayed disclosure,

this did not warrant admission of the syndrome itself, or the syndrome as a whole."  He

further argues the court abused its discretion in admitting the evidence without

determining its reliability or the relevance of each component.  He asserts CSAAS

provides "a blanket reality that avoids any particulars—and permits the jury to avoid

confronting problems of proof in those particulars."  He asserts the error was prejudicial

because the prosecutor relied heavily on the CSAAS evidence in closing and argued such

evidence established the victims in this case were in fact sexually abused.  The People

respond that the CSAAS evidence was relevant and probative to assist the jury in

evaluating the victims' credibility and the court properly admitted it "[i]n accordance

with longstanding case law permitting the admission of CSAAS evidence."  They further

contend any alleged error was harmless.  We agree with the People.

Contrary to defendant's contentions that "there was no rehabilitative need

identified" to warrant the CSAAS testimony to rehabilitate the complainants' testimony

in this case, Christopherson's testimony regarding secrecy, helplessness, entrapment and

accommodation, and delayed and unconvincing reporting could all be deemed relevant to

the jury's assessment of the complaining witnesses' credibility.  Here, all four victims did

not immediately report the abuse.  Rather, they kept the abuse a secret.[4]  A.S. testified

---

[3] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013.

[4] During cross-examination of H.P., defense counsel probed H.P. asking her "you
didn't cry out at all?"; "[e]ven though it was painful?"  (Boldface omitted.)  He
highlighted that H.P. did not report the abuse until years after and questioned H.P.
regarding the circumstances of the disclosure.  I.T. reported telling her mother about the

15.

defendant expressly told her not to tell anyone about the abuse. D.B. testified she did not report the abuse because she did not think anyone would believe her, and D.B., A.S., and H.P. all stated they did not report the abuse because they were scared. Defense counsel questioned D.B. regarding why her sister would think she is a liar and pointed out that D.B. disclosed incidents at trial that she had not previously disclosed. Defense counsel also prodded I.T. regarding the fact she did not disclose all the incidents to the examiner when she was five years old, but rather disclosed more over the years. And counsel asked I.T. what prompted her to ultimately disclose the abuse after it occurred. Defense counsel challenged all the witnesses regarding perceived gaps or inconsistencies in their reports. Accordingly, Christopherson's testimony regarding secrecy, delayed, unconvincing, and incremental disclosure, feelings of helplessness, and entrapment in that children "are not equipped to handle these kinds of situations, so they often feel trapped and they don't know what to do" was relevant and probative to the jury's assessment of this testimony and to the victims' credibility.

We also cannot conclude, as defendant urges, that the CSAAS evidence was "unduly prejudicial." (Underscoring omitted.) "Evidence is not 'prejudicial' merely because it is harmful to a criminal defendant's case. [Citation.] Indeed, essentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case. Evidence only creates 'undue prejudice' if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.) Here, Christopherson testified he was not familiar with the facts or issues in this case. He did not opine that the complaining witnesses were victims of sexual abuse and the jury was expressly instructed that CSAAS evidence is not evidence

---

incident during which she touched defendant's "private part" (boldface omitted) not in 2011, but over the years.

that defendant committed the charged crimes. Rather, it could only be considered in deciding whether the victims' conduct was not inconsistent with the conduct of someone who had been molested and in evaluating the believability of the victims' testimony. (See CALCRIM No. 1193.)

Given the facts and issues of this case, we cannot conclude the court abused its broad discretion in concluding the probative value of the CSAAS evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (See Evid. Code, § 352; see also *Lapenias*, *supra*, 67 Cal.App.5th at p. 174 [" 'The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.' "].) The court did not act in an arbitrary and capricious manner but rather conducted a lengthy, reasoned inquiry and analysis regarding the relevance and probity of such evidence before it held it admissible. Thus, we find no abuse of discretion.

To the extent defendant is challenging the general admissibility or reliability of CSAAS evidence, as defendant acknowledges, this issue is settled in California. (See *Sedano*, *supra*, 88 Cal.App.5th at p. 479; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171; see also *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; *Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394). That is, California courts including the California Supreme Court, have held such evidence is admissible in California for the limited purpose of disabusing a jury of misconceptions about how a child reacts to molestation. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; see also *Sedano*, *supra*, 88 Cal.App.5th at pp. 479–480; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171; *Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394.) While defendant asserts courts in other jurisdictions have disapproved of the use of CSAAS evidence and questioned the reliability of such evidence (see, e.g., *State v. J.L.G.* (2018) 234 N.J. 265, 271–272; *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d 610,

17.

614; *Hadden v. State* (Fla. 1997) 690 So.2d 573, 577; *Newkirk v. Commonwealth* (Ky. 1996) 937 S.W.2d 690, 693–694; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 562),[5] we are bound by the *McAlpin* decision. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 216; *People v. Munch* (2020) 52 Cal.App.5th 464, 468; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) " 'That other jurisdictions may disagree with it does not change its impact on California cases.' " (*People v. Ramirez*, *supra*, at p. 216; accord, *People v. Munch*, *supra*, at p. 468.)

Accordingly, we reject defendant's contentions.

## **DISPOSITION**

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.

---

[5] Defendant also cites *Commonwealth v. Dunkle* (1992) 529 Pa. 168, 176–177 as a case disapproving the use of CSAAS evidence, but this case has since been superseded by statute as stated in *Commonwealth v. Jones* (2020) 663 Pa. 20, 44, to the extent it could be read "as categorically prohibiting expert testimony concerning victim behavior in response to sexual abuse due to it being within the ken of laypeople and not requiring expert analysis" (*ibid.*).